**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

JOHN CICHONKE,                               :
                                             :        CIVIL ACTION
                    Plaintiff,               :
                                             :
        v.                                   :
                                             :        NO.  14-4243
BRISTOL TOWNSHIP, et al.,                    :
                                             :
                    Defendants.              :

**MEMORANDUM**

BUCKWALTER, S. J.                                        December 14, 2015

        Currently pending before the Court is the Motion by Defendants Bristol Township,

William McCauley, and Scott Swichar (collectively, "Defendants") for Summary Judgment as to

all federal and state law claims asserted by Plaintiff John Cichonke ("Plaintiff").  For the

following reasons, the Motion is granted in part and denied in part.

**I.      FACTUAL BACKGROUND**[1]

        Plaintiff John Cichonke ("Plaintiff") was employed by Defendant Bristol Township in its

Sewer Treatment Plant operations from December 19, 1988 until his retirement on June 18,

2013.  (Defs.' Mem. Supp. Mot. Summ. J. 2; Ex. 1, Deposition of John Cichonke, Feb. 26, 2015

("Plaintiff Dep.") 10:5–9, 77:21–23.)  At the time Plaintiff retired, he was a full-time station lift

---

[1] The statement of facts is compiled from a review of the parties' statements of facts, briefs, and the evidence submitted in conjunction with those briefs.  To the extent the parties allege a fact that is unsupported by evidence, the Court does not include it in the recitation of facts.  Where the parties have specifically cited exhibits attached to their briefs, the Court has reviewed and considered those cited materials.  See Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

mechanic for Sewer Plant Operations.  (Defs.' Mem. Supp. Mot. Summ. J. 2–3; Plaintiff Dep. 10:17–19.)

Defendant William McCauley ("McCauley") has been employed by Defendant Bristol Township as Township Manager since January 2012.  (Defs.' Mem. Supp. Mot. Summ. J. 3; Deposition of William McCauley, Apr. 7, 2015 ("McCauley Dep.") 15:4–6.)  At the time Plaintiff retired, his supervisor was Defendant Scott Swichar ("Swichar").  (Defs.' Mem. Supp. Mot. Summ. J. 3; Plaintiff Dep. 56:4–6.)  According to McCauley, Swichar was not pleased with Plaintiff's job performance because Plaintiff "didn't work too hard or accomplish too much in terms of job duties and pump station inspections."  (Defs.' Mem. Supp. Mot. Summ. J. 3; McCauley Dep. 131:11–13.)  Defendants were not satisfied with Plaintiff's job performance with respect to pump station maintenance and collection at a time when Defendants were under pressure to comply with a United States Environmental Protection Agency ("EPA") consent decree.  (Defs.' Mem. Supp. Mot. Summ. J. 3; McCauley Dep. 128:13–24, 132:14–23.)  The EPA, along with the Pennsylvania Department of Environmental Protection ("DEP"), had written a "scathing inspection report" which criticized the conditions of the collection systems, the maintenance of which fell under Plaintiff's responsibilities.  (Defs.' Mem. Supp. Mot. Summ. J. 3; McCauley Dep. 128:13–24.)

In his deposition testimony, Plaintiff acknowledged that he and Swichar did not have a good working relationship from the start.  (Defs.' Mem. Supp. Mot. Summ. J. 3; Plaintiff Dep. 56:15–21.)  Many of their disagreements were related to Plaintiff's role as the Union Shop Steward.  (Defs.' Mem. Supp. Mot. Summ. J. 3; Plaintiff Dep. 60:4–18.)  Plaintiff filed numerous grievances against Bristol Township management during the course of his employment, alleging violations of the Collective Bargaining Agreement ("CBA") as well as

"harassment." (Defs.' Mem. Supp. Mot. Summ. J. 3; Plaintiff Dep. 19:6–20, 23:3–21, 65:9–78:24 and Plaintiff Dep. Ex. 4.)

In 2010, Plaintiff was diagnosed with trigeminal neuralgia, a condition which caused him to regularly suffer from severe and debilitating pain, described as "shooting pain, like a shock pain," and which at times prevented him from moving his jaw to eat. (Pl.'s Resp. Opp'n Summ. J. 2; Ex. 1, Transcript of Pennsylvania Labor Relations Board Hearing at 59:7–14, Transport Workers Union of America, Local 282 v. Bristol Township (Mar. 28, 2014) (No. PERA-C-13-236-E)[2] ("Pa. Labor Relations Bd. Hrg. Tr."); Plaintiff Dep. 27:4–16.) In 2011,[3] Plaintiff underwent surgery in an attempt to alleviate his symptoms, but the surgery was unsuccessful and he continued to suffer from "frequent, severe, and debilitating" flare-ups, which at times required him to miss work. (Pl.'s Resp. Opp'n Summ. J. 2; Plaintiff Dep. 27:17–22, 28:24–29:1.) During flare-ups, the pain is such that Plaintiff must immediately lay down, put pressure on his jaw, and, at times, take medication to decrease the pain. (Pls.' Resp. Opp'n Summ. J. 2–3; Plaintiff Dep. 36:7–14.)

On or about February 19, 2013, Plaintiff spoke with Paula Kearns ("Kearns"), a human resources officer, about his trigeminal neuralgia. (Pl.'s Resp. Opp'n Summ. J. 3; Plaintiff Dep. 33:24–34:12.) Plaintiff testified at his deposition that he wanted to speak to her about sick time, and that Kearns told him that he should go on family medical leave. (Id.) On February 19,

---

[2] Plaintiff indicates that the cited hearing testimony appears at "pp. 7–14" of that transcript. (Pl.'s Resp. Opp'n Summ. J. 2.) In fact, Plaintiff's hearing testimony regarding his trigeminal neuralgia appears on page fifty-nine of that transcript, at lines seven through fourteen. The Court included the correct citation above.

[3] In his deposition testimony, when asked whether his surgery was in 2011, Plaintiff responded that it was "[l]ate 2010, I believe." (Plaintiff Dep. 27:17–19.) Defendants' counsel attempted to clarify the date because he believed the Complaint indicated that Plaintiff's surgery was in February 2011, and Plaintiff stated that he was "not sure on dates" regarding his surgery. (Id. at 27:20–28:1.)

2013,[4] Plaintiff submitted a request for intermittent leave pursuant to the Family and Medical

Leave Act ("FMLA").  (Defs.' Mem. Supp. Mot. Summ. J. 3–4; Ex. 3, Bristol Township FMLA

Request Form; Ex. 4, Plaintiff's Medical Certification Form dated Feb. 19, 2013.)  Plaintiff

testified at an Unemployment Compensation Appeal Hearing that Kearns told him that his

application was approved.  (Pl.'s Resp. Opp'n Summ. J. 3; Ex. 3, Transcript of Unemployment

Compensation Appeal Hearing at 10, Claimant John Cichonke (Oct. 28, 2013) (Appeal No. 13-

09-F-7922) ("Unemployment Compensation Appeal Tr.".)  According to Plaintiff, Kearns told

him he was on FMLA leave a couple of times, and when he gave her his FMLA application, she

told him both that it was approved and could not be denied, and that his second doctor's note[5]

was on the manager's desk and was approved.  (Pl.'s Resp. Opp'n Summ. J. 3–4; Unemployment

Compensation Appeal Tr. at 10.)  Plaintiff also testified that when he called out, he did not

distinguish between sick leave and intermittent FMLA leave, but that Kearns told him it was

being designated as FMLA leave.  (Pl.'s Resp. Opp'n Summ. J. 4; Unemployment Compensation

Appeal Tr. at 18.)  According to Plaintiff, he called Kearns a few times to ask her for a copy of

his FMLA request and to ascertain whether McCauley had signed it yet.  (Pl.'s Resp. Opp'n

Summ. J. 4; Plaintiff Dep. 49:24–50:4.)  Plaintiff stated that Kearns told him that the FMLA

requests and Medical Certifications were on McCauley's desk for his signature, but that Kearns

never told him that McCauley refused to approve his request for intermittent FMLA leave.  (Pl.'s

Resp. Opp'n Summ. J. 4; Plaintiff Dep. 49:5–23, 50:5–15.)  On February 25, 2013, Kearns sent

---

[4] The form is dated February 19, 2013.  (See Defs.' Ex. 4.)  Plaintiff testified at his deposition that his wife dropped the form off for him on February 20, 2013, because he was in the hospital.  (Plaintiff Dep. 37:9–15.)

[5] Presumably this refers to the March 4, 2013 medical certification form related to Plaintiff's hospitalization for a pulmonary embolism, discussed below.

4

an email to Defendant Swichar regarding Plaintiff which said "[e]mployee continues on FMLA." (McCauley Dep. 70:21–73:1.)

Defendants assert that the Bristol Township FMLA form was incomplete because all of the questions on the second page regarding intermittent leave were left blank, and that the Medical Certification Form was incomplete because the section regarding "Explanation of Extent to Which Employee is Unable to Perform the Functions of His or Her Job" was left blank. (Defs.' Mem. Supp. Mot. Summ. J. 3; Ex. 3; Ex. 4.) Defendant McCauley returned the incomplete FMLA forms to Kearns and asked her to request that Plaintiff submit a completed form. (Defs.' Mem. Supp. Mot. Summ. J. 3; McCauley Dep. 49:2–12, 76:14–21; Ex. 5, McCauley's Confidential Secretary's Log at 3.) There was no request that Plaintiff obtain a second medical opinion. (Defs.' Mem. Supp. Mot. Summ. J. 5; McCauley Dep. 61:5 –11; Ex. 6, Deposition of Paula Kearns, Dec. 16, 2014 ("Kearns Dep.") 14:1–5, 25:19–23.) Plaintiff never submitted a completed version of the February 19, 2013 form. (Defs.' Mem. Supp. Mot. Summ. J. 4; Plaintiff Dep. 42:3–6, 42:13–15.) Plaintiff testified at his deposition that he never spoke to Defendant Swichar about his request for FMLA leave. (Defs.' Mem. Supp. Mot. Summ. J. 9; Plaintiff Dep. 60:19–21.) Plaintiff testified at his Unemployment Compensation Appeal Hearing that Defendants never provided him with written notification that they considered the medical certification for intermittent FMLA leave incomplete, or of what additional information they required. (Pl.'s Resp. Opp'n Summ. J. 4; Unemployment Compensation Appeal Tr. at 10, 18.) McCauley testified at his deposition that he did not provide in writing any reasons why Plaintiff's FMLA was not approved, but answered affirmatively when asked whether he had delegated that task to Kearns. (McCauley Dep. 79:4–17.) Kearns testified at her deposition that she did not receive a copy of a signed approval from McCauley, and that she did not talk to

McCauley about why he did not give the form back to her.  (Kearns Dep. 13:4–10.)  Kearns did not see a document approving or disapproving Plaintiff's forms.  (Id. at 21:5–9.)  Kearns answered affirmatively when asked whether other employees' time was treated as FMLA time even when McCauley had not signed their forms.  (Id. at 21:18–21.)

On February 20, 2013, Plaintiff was admitted to the hospital for a pulmonary embolism and remained hospitalized until February 25, 2013.  (Defs.' Mem. Supp. Mot. Summ. J. 5; Ex. 7, March 4, 2013 Medical Certification Form.)  During his hospitalization, Plaintiff missed three consecutive work days, which meant he was required to provide a doctor's note pursuant to the CBA and the Bristol Township Employee Handbook.  (Defs.' Mem. Supp. Mot. Summ. J. 7; Plaintiff Dep. 46:19–24; Ex. 8, Collective Bargaining Agreement Between Township of Bristol and Transport Workers Union of America, Local 282, AFL-CIO (Treatment Plant Agreement) for January 1, 2006–December 31, 2010[6] at Art. XIII(a)[7]; Ex. 9, Bristol Township Employee Handbook, Art. XV § B.)  According to Defendants, Plaintiff submitted the March 4, 2013 Medical Certification pursuant to the three-day provision.[8]  (Defs.' Mem. Supp. Mot. Summ. J. 5; Ex. 7.)  Plaintiff testified at his deposition that his hospitalization in February 2013 was unrelated to the medical diagnosis referred to in his FMLA request form.  (Defs.' Mem. Supp. Mot. Summ. J. 5; Plaintiff Dep. 45:7–20.)  Plaintiff requested that the days he took off from

---

[6] Defendants do not indicate whether this 2006–2010 CBA was still in effect during the relevant events in this case, which occurred in 2013.

[7] Defendants incorrectly refer to the relevant provision as Article XV(B).

[8] Defendants assert that "the Second Medical Certification provides no statement that Plaintiff cannot perform his essential job duties or that his condition continued beyond his hospitalization and follow-up treatment."  (Defs.' Mem. Supp. Mot. Summ. J. 5–6 (citing Ex. 7).)  Presumably Defendants refer to the section of the document that asks for "Explanation of Extent to Which Employee is Unable to Perform the Functions of His or Her Job" in which the doctor who completed the form wrote "Cites Discomfort."  (Ex. 7.)

work following his hospitalization count as vacation days, and his request was approved.  (Defs.'
Mem. Supp. Mot. Summ. J. 6; Ex. 10, Plaintiff's Time Off Activity Report.)

Plaintiff called out sick from work on June 5 and June 6, 2013.  (Defs.' Mem. Supp. Mot.
Summ. J. 6; Ex. 11, June 2013 Call Out Line Information.)  Plaintiff went to CVS around noon
to pick up medication for his trigeminal neuralgia.  (Pl.'s Resp. Opp'n Summ. J. 5; Plaintiff Dep.
53:1–54:8; Pa. Labor Relations Bd. Hrg. Tr. 60:1–3; 66:16–20.)  Defendants contend that they
received a report that on June 6, 2013, Plaintiff was drinking at a Veterans of Foreign Wars
("VFW") establishment.[9]  (Defs.' Mem. Supp. Mot. Summ. J. 6.)  Kearns and Defendant
Swichar went to the VFW to investigate if Plaintiff was abusing sick leave under Bristol
Township's sick leave policy, which prohibits employees from using sick days as additional paid
time off.  (Id.; Ex. 9; Ex. 12, June 10, 2013 Memorandum from Swichar to McCauley.)  Kearns
and Defendant Swichar did not see Plaintiff when they were inside the VFW, but after they
exited the building, they saw Plaintiff walking from the front of the VFW building to his car,
which was parked in the VFW parking lot.  (Defs.' Mem. Supp. Mot. Summ. J. 6; Ex. 12.)
Kearns testified at her deposition that she did not smell alcohol, and that Plaintiff did not appear
intoxicated.  (Kearns Dep. 38:6–18.)  Plaintiff testified at his deposition that "[w]hen I came out
and they seen [sic] me there, I—I was threatened again that they were going to accuse me of
drinking."  (Plaintiff Dep. 73:16–19.)

Plaintiff asserts that he was at the VFW that day to assist the VFW President with
paperwork.  (Defs.' Mem. Supp. Mot. Summ. J. 6; Plaintiff Dep. 54:12–17.)  The VFW President
called Plaintiff to ask for his help while Plaintiff was out to pick up medication.  (Pa. Labor

---

[9] Defendants do not include a citation to any record evidence for this contention.  Plaintiff
asserts that Defendant McCauley's claim regarding the tip is not credible because he could not
recall who the tipster was, and did not document the call.  (Pl.'s Resp. Opp'n Summ. J. 5; Pa.
Labor Relations Bd. Hrg. Tr. 24:6–14.)

Relations Bd. Hrg. Tr. 60:3–9.)  Plaintiff lives across the street from the VFW, but parked his car

in the VFW parking lot.  (Id. at 60:9–11.)  Plaintiff assisted with paperwork for approximately

thirty minutes to one hour.  (Pl.'s Resp. Opp'n Summ. J. 5; Pa. Labor Relations Bd. Hrg. Tr.

60:1–14; 66: 16–11.)  Plaintiff also called out sick the following day, June 7, 2013.[10]  (Defs.'

Mem. Supp. Mot. Summ. J. 6; Ex. 11; Ex. 12.)

　　　　Plaintiff returned to work on June 10, 2013, and was met at the Silver Lake Pumping

Station by Defendant Swichar.  (Defs.' Mem. Supp. Mot. Summ. J. 6; Plaintiff Dep. 61:19–22.)

Defendant Swichar told Plaintiff that he was taking Plaintiff to a nearby Healthworks to have a

Breathalyzer test administered.  (Defs.' Mem. Supp. Mot. Summ. J. 6–7; Plaintiff Dep. 62:4–7.)

Defendant McCauley testified previously that, as he understood from a conversation with

Defendant Swichar, the basis for reasonable suspicion to administer the test to Plaintiff was that

Plaintiff "appeared to have been drinking" on June 6, 2013.  (Pa. Labor Relations Bd. Hrg. Tr.

16:4–11.)  Defendant Swichar testified at Plaintiff's Unemployment Compensation Appeal that

his reasonable suspicion on June 10, 2013 was "based on the fact that [Plaintiff] was at the VFW

[on June 6, 2013], [and] it was indicative to me of a possible drinking problem."

(Unemployment Compensation Appeal Tr. at 17.)  Defendant Swichar testified that he was not

familiar with the drug and alcohol testing policy, and that he relied on his instincts to determine

if someone was impaired.[11]  (Id. at 12–13.)  Defendant McCauley testified that Bristol Township

---

[10] Defendants assert that there is "no indication that [Plaintiff] requested FMLA leave apply" to June 5, 6, or 7 in 2013.  (Defs.' Mem. Supp. Mot. Summ. J. 6).  In support of that assertion, Defendants cite a portion of Paula Kearns's deposition testimony where she explained how someone would let the call out line know that they wanted to use a sick day as opposed to a day of FMLA leave.  (Id. (citing Kearns Dep. 10:21–24, 11:1–4).)  It should be noted that Defendants' citation is incorrect, and that the referenced testimony actually appears on later pages of the cited deposition.  (See Kearns Dep. 16:2–17:15.)

[11] Defendant Bristol Township's policy regarding alcohol testing states the following:

had an obligation to review and understand the drug and alcohol testing policy, but that he was not familiar with parts of that policy. (Pa. Labor Relations Bd. Hrg. Tr. 28:8–19.) Supervisors, including Defendant Swichar, had not been trained in accordance with the policy. (See, e.g., Pa. Labor Relations Bd. Hrg. Tr. 22:11–23:9.) Defendant McCauley testified previously that this was because "[w]e just haven't gotten around to it yet." (Id. at 23:11.)

At his deposition, Plaintiff testified about whether he consented to the Breathalyzer test as follows:

> Q. Okay. Did you say, I refuse to take [the Breathalyzer test]?
> A. I told him I—I could refuse it, but I will take it.
> [. . .]
> Q. Okay. And you told him you had the right to refuse it, but you were going to take it?
> A. Yes.

(Defs.' Mem. Supp. Mot. Summ. J. 7; Plaintiff Dep. 62:8–18.)[12] Plaintiff subsequently submitted an Affidavit stating that he "did not voluntarily agree to submit to the breathalyzer

---

> The required observations for alcohol and/or controlled substances reasonable suspicion testing must be based on specific contemporaneous, articulable observations concerning the appearance, behavior, speech, or body odors of the employee and must be made by a supervisor or manager who is trained in accordance with the following requirements:
>
> (a) Supervisors/managers designated to determine whether reasonable suspicion exists to require an employee to undergo alcohol or controlled substance testing must receive at least one hour of training on alcohol misuse and at least one hour of training on controlled substances.
>
> (b) The training provided by the contractor must cover the physical, behavioral, speech, and performance indicators of probable alcohol misuse and use of controlled substances.

(Pl.'s Resp. Opp'n Summ. J. 6; Ex. 7, Mar. 1, 2013 Settlement of Drug Testing Grievance.)

[12] Defendants also cite Exhibit 4 to Plaintiff's deposition, which is a copy of a series of Plaintiff's handwritten notes regarding treatment that Plaintiff believes was harassment.

test.  I only submitted to the test because I would have been subject to immediate dismissal if I refused" and that "[t]he union advises all of its bargaining unit members to take the drug or alcohol test and challenge it afterwards."  (Pl.'s Resp. Opp'n Summ. J. Ex. 20, July 10, 2015 Affidavit of John Cichonke ("Plaintiff Aff.").)  Plaintiff finished working that day, but asked to take the rest of the week off as vacation time from June 11 to June 14, 2013, which was approved.  (Defs.' Mem. Supp. Mot. Summ. J. 7; Plaintiff Dep. 79:15–20, 80:2–6.)

Plaintiff also called out sick on June 17, 2013, which exhausted his sick leave.  (Defs.' Mem. Supp. Mot. Summ. J. 7; Plaintiff Dep. 86:21–87:2, 92:24–93:3.)  Plaintiff testified at his deposition that he could not recall whether he called out sick on June 17, 2013 because of his trigeminal neuralgia.  (Id.; Plaintiff Dep. 87:1–20.)  On June 18, 2013, Plaintiff called out sick again, but did not recall whether the reason he called out sick was the trigeminal neuralgia.  (Id.; Plaintiff Dep. 88:1–7.)

On June 18, 2013, Defendant McCauley, Defendant Swichar, and a human resources employee named Kate Murphy exchanged a series of emails about Plaintiff:

- Subject Line: FW: Day Off Approval
- Text: [Plaintiff] out sick again today.  He exhausted all his sick time.  Tomorrow is the big day!

(Pl.'s Ex. 12, Email from Def. Swichar to Def. McCauley, June 18, 2013, 9:07 a.m.)

- Subject: RE: Day Off Approval
- Text: Scott, Deliver a letter to [Plaintiff] telling him that he is absent without approved leave.  Tell him that he is subject to disciplinary action up to and including discharge from employment.  Order him to return to work immediately.  Let's turn up the heat on him.  He may think he is going to keep calling in sick until he is ready to retire.  He needs to understand that this is not one of his options.  Should you have

---

Defendants do not provide a quotation from that Exhibit, nor do they indicate the page or pages on which they rely.

any questions, please let me know.   Thank you for your attention to this matter.  Bill.

(Pl.'s Ex. 12, Email From Def. McCauley to Def. Swichar, June 18, 2013, 9:26 a.m.)

- Subject: John Cichonke
- Text: I just spoke with Alison and as I am sure you know [Plaintiff] called out again and he is out of sick time.  Last week [Plaintiff] came in and asked if he could get a copy of his FMLA paperwork—I have looked in his file and through the computer with Paula's files to no avail.  When speaking with Alison she stated that if this paperwork is not correct and complete with the appropriate documentation from a doctor then the request more than likely would be denied.  During our conversation last week [Plaintiff] did state that he was told by Paula that FMLA cannot be denied because it is a law—my understanding is that the employee requesting FMLA needs to provide documentation stating their reasoning for the request; my late night reading yesterday was very informative.  As it stands now per Alison she is placing his absences in TIMES as No Pay.

(Pl.'s Ex. 13, Email from Kate Murphy to Def. McCauley, June 18, 2013, 10:14 a.m.)

- Subject: RE: RE: John Cichonke
- Text: Kate, his FMLA request is on my desk.  Unfortunately, being a bum is not enough to qualify for FMLA.[13]  I will dig out the paperwork this afternoon.

(Pl.'s Ex. 13, Email from Def. McCauley to Kate Murphy, June 18, 2013, 2:28 p.m.)

---

[13] Defendant McCauley testified at his deposition that "obviously I shouldn't have said that, but it was—Mr. Cichonke wasn't a good employee.  He didn't—he took excessive sick time and he didn't—when he did show up, he just didn't work too hard."  (McCauley Dep. 66:14–19.) Defendant McCauley explained that his conclusions were based on the fact that he "saw the numerous—I saw the numerous instances of sick leave and that the majority of them . . . if it was three days when you have to come in with . . . a doctor's note, I mean, he would take two and then come back and work a day.  I think there was—I think I recall there being a Monday-Friday pattern.  [. . .] with the numerous sick days [on top of the amount of vacation time Plaintiff was entitled to] he just wasn't that productive an employee."  (<u>Id.</u> at 66:23–67:16.)  Defendant McCauley also testified that he had no evidence that any of Plaintiff's sick days were not legitimate.  (<u>Id.</u> at 67:17–24.)

- Subject: Revised Letter
- Text: Scott, Drop off the letter today and mail one to him regular mail.  See what happens.  He thinks he has FMLA and can hang around for 12 weeks.

(Pl.'s Ex. 14, Email from Def. McCauley to Def. Swichar and Kate Murphy, June 18, 2013,

2013, 2:46 p.m.)

- Subject: Another one bites the dust![14]
- Text: [Plaintiff] is here letting people know that today is his last day.

(Pl.'s Ex. 15, Email from Kate Murphy to Def. McCauley, June 18, 2013, 3:56 p.m.)

- Subject: Another one bites the dust!
- Text: Good riddance!

(Pl.'s Ex. 15, Email from Def. McCauley to Kate Murphy, June 18, 2013, 4:19 p.m.)

- Subject: Another one bites the dust!
- Text: I didn't think you'd be sad!

(Pl.'s Ex. 15, Email from Kate Murphy to Def. McCauley, June 18, 2013, 8:19 p.m.)

Bristol Township's Employment Handbook defines sick leave as "approved absence from

work" for various health-related reasons, whereas absence without leave ("AWOL") is defined

as "the absence of an employee from duty that is not authorized.  AWOL shall be without pay

and subject to disciplinary action or dismissal."  (Defs.' Mem. Supp. Mot. Summ. J. 7; Ex. 9 at

Art. XV, Art. XIX.)  The CBA contains similar language.  (Defs.' Mem. Supp. Mot. Summ. J. 7–

8; Ex. 8 at Art. XV § 4(b).)  The CBA also has a no-fault attendance policy which provides that

---

[14] In his brief, Plaintiff incorrectly quotes the subject line of this email exchange as "Another bum bites the Dust!"  (See Pl.'s Resp. Opp'n Summ. J. 10 (citing Pl.'s Ex. 15).)  The correct subject line quotation is above.

any employee who has exhausted all allowable sick leave will be permitted to have absences

without pay.  (Pl.'s Resp. Opp'n Summ. J. 8; Ex. 16, CBA, at Art. XIII.)

On June 18, 2013, after Plaintiff did not appear for work, Defendant Swichar hand-

delivered a letter to Plaintiff, which stated the following:

> This letter is to inform you that you have exhausted your sick leave
> as of June 18, 2013.  However, you failed to report to work today
> and are now in an unpaid status.  Since this sick leave has not been
> approved, you are ordered to return to work immediately.
>
> If I do not hear from you today, I will assume that you have
> abandoned your position and you will be subject to disciplinary
> action, up to and including discharge from employment.
>
> I look forward to hearing from you very soon.  You can reach me
> at: [phone number].  Thank you for your prompt attention in this
> matter.

(Defs.' Mem. Supp. Mot. Summ. J. 8; Ex. 13, June 18, 2013 Letter from Defendant Swichar to

Plaintiff.)  No disciplinary action was taken at the time the letter was written.[15]  (Defs.' Mem.

Supp. Mot. Summ. J. 8; McCauley Dep. 100:20–101:24.)  That same day, Plaintiff voluntarily

retired from his position, and on the following day he submitted a formal letter advising of his

retirement.  (Defs.' Mem. Supp. Mot. Summ. J. 8; Plaintiff Dep. 77:21–78:2; Ex. 14, Letter from

Plaintiff informing Bristol Township of his retirement.)  Plaintiff resigned because he felt he

could no longer endure what he perceived as Defendants' harassment.  (Pl.'s Resp. Opp'n

Summ. J. 10; Plaintiff Dep. 78:14–79:1.)

---

[15] Plaintiff asserts that, in accordance with the CBA's no-fault attendance policy, he could not be terminated until receiving a first warning, a second warning, and a one-day suspension after eleven absences and/or lateness occurrences, and that a written warning would be issued at each step.  (Pl.'s Resp. Opp'n Summ. J. 8; Ex. 16, CBA at Art. XIII.)  None of these procedural steps were taken and Plaintiff was not counseled pursuant to the no-fault policy. (Pl.'s Resp. Opp'n Summ. J. 8; McCauley Dep. 85:24–95:2.)

On June 19, 2013, Plaintiff asked "Kate" for copies of his FMLA documents.[16]  (Plaintiff

Dep. 93:17–20.)  Plaintiff testified that Kate told him the FMLA application was still on

Defendant McCauley's desk, and that he did not receive copies that day.  (Pl.'s Resp. Opp'n

Summ. J. 10; Plaintiff Dep. 93:22.)  According to Plaintiff, he called Bristol Township several

times during the weeks of June 20, 2013 through July 10, 2013 to inquire about getting copies of

his FMLA documents, but was repeatedly told that they were on Defendant McCauley's desk.

(Pl.'s Resp. Opp'n Summ. J. 10.)[17]

On April 21, 2015, counsel for Bristol Township sent Plaintiff a check for his accrued

and unused vacation pay in the amount of $2,102.45.[18]  (Defs.' Mem. Supp. Mot. Summ. J. 9;

Ex. 16, Cover Letter, certified mail receipts, payroll record, and check image.)  A check for

Plaintiff's accrued and unused vacation time had been prepared on June 30, 2013, but, according

to Plaintiff, Defendant McCauley refused to allow payment to be made.  (Pl.'s Resp. Opp'n

Summ. J. 10; Ex. 9, Township of Bristol Payroll Account Check No. 1379, Payable to John

Cichonke for $2,102.45.)  The April 2015 check did not include any interest which would have

accrued since Plaintiff's last day of work.  (Pl.'s Resp. Opp'n Summ. J. 10–11.)

Plaintiff filed a Complaint in this case on July 15, 2014, and filed an Amended Complaint

on October 14, 2014.  Defendants filed a Motion to Dismiss the Amended Complaint on

---

[16] Presumably "Kate" is Kate Murphy, a Bristol Township human resources employee.

[17] Plaintiff cites his testimony before the Unemployment Compensation Board of Review during his unemployment compensation appeal hearing in support of his assertion that he repeatedly called Bristol Township during June and July of 2013.  (See Pl.'s Resp. Opp'n Summ. J. 10 (citing Unemployment Compensation Appeal Tr. at 3).)  The cited testimony makes no mention of phone calls, the number of phone calls, or the dates during which they were made.

[18] In their Memorandum of Law, Defendants incorrectly refer to the dollar amount of the check as "$2,107.46."  (Defs.' Mem. Supp. Mot. Summ. J. 9.)  In fact, the photocopy of a check made out to Plaintiff indicates that he was paid $2,102.45, which is the amount the Court refers to above.  (See Defs. Ex. 16.)

November 3, 2014.  Defendants' Motion to Dismiss was granted in part and denied in part by this Court on March 25, 2015.  See Cichonke v. Bristol Twp., No. Civ.A.14-4243, 2015 WL 1345439 (E.D. Pa. Mar. 25, 2015).  Defendants filed a Motion for Summary Judgment as to all of Plaintiffs' remaining claims on June 15, 2015.  Plaintiff filed a Response in Opposition on July 15, 2015.  Defendants filed their Reply on July 27, 2015.  Plaintiff filed a Sur-reply on August 5, 2015.  Defendants' Motion for Summary Judgment is now ripe for judicial consideration.

## II.    STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  A factual dispute is "material" only if it might affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party.  Id.

On summary judgment, the moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact.  Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145–46 (3d Cir. 2004).  It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations.  Boyle v. Cty. of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermkts., Inc. v. Darling-Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)).  Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475

U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg

Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987).

Although the moving party must establish an absence of a genuine issue of material fact,

it need not "support its motion with affidavits or other similar materials negating the opponent's

claim." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). It can meet its burden by "pointing

out . . . that there is an absence of evidence to support the nonmoving party's claims." Id. at

325. If the non-moving party "fails to make a showing sufficient to establish the existence of an

element essential to that party's case, and on which that party will bear the burden at trial,"

summary judgment is appropriate. Celotex, 477 U.S. at 322. Moreover, the mere existence of

some evidence in support of the non-movant will not be adequate to support a denial of a motion

for summary judgment; there must be enough evidence to enable a jury to reasonably find for the

non-movant on that issue. Anderson, 477 U.S. at 249–50.

## III.   DISCUSSION

Plaintiff alleges numerous federal constitutional and statutory claims, as well as a state

law breach of contract claim, stemming from conduct attributable to Defendants Bristol

Township, William McCauley, and Scott Swichar. After careful consideration, the Court finds

that Defendants have demonstrated an absence of genuine issues of material fact, and that no

reasonable fact-finder would be able to return a verdict in Plaintiffs' favor, with respect to the

"second certification" aspect of Plaintiff's FMLA interference claims in Counts Eight, Nine,

Ten, Eleven, Twelve, and Thirteen, as well as the "second certification" aspects of Plaintiff's

FMLA retaliation claims in Counts Fourteen, Fifteen, and Sixteen. Defendants' Motion for

Summary Judgment is also granted with respect to Plaintiffs' ADEA claims in Counts Eighteen,

Nineteen, and Twenty, on the basis of Plaintiff's withdrawal of those claims. The Court,

however, finds that there are genuine issues of material fact which preclude granting summary judgment as to Plaintiff's claims in Counts Two, Three, and Seven, the remaining aspects of Plaintiff's FMLA interference and retaliation claims in Counts Eight, Nine, Ten, Eleven, Twelve, Thirteen, Fourteen, Fifteen, and Sixteen, the breach of contract claim in Count Seventeen, and Plaintiffs' claims for punitive damages in connection with Counts Two and Three.  Accordingly, Defendants' Motion for Summary Judgment is denied as to those claims.  The Court discusses each of Plaintiff's claims in turn.

### A.    Alcohol Testing Without Reasonable Suspicion (Counts II and III)

Plaintiff asserts Fourth Amendment claims, pursuant to 42 U.S.C. § 1983, against Defendants McCauley and Swichar for requiring him to take a Breathalyzer test on June 10, 2013 against his will, without the required training and knowledge, and without articulable observations.  (Am. Compl. ¶¶ 98, 100, 112–14, 120–25.)  Plaintiff asserts his Fourth Amendment claims against Defendants McCauley and Swichar in their official and individual capacities.  (Id. ¶¶ 118, 128.)

"Cases interpreting the scope of the Fourth Amendment establish that drug testing of public employees may raise search and seizure issues."  Dykes v. Se. Pa. Transp. Auth., 68 F.3d 1564, 1567 (3d Cir. 1995) (citing Skinner v. Ry. Labor Execs.' Assoc., 489 U.S. 602 (1989); Nat'l Treasury Emps. Union v. Von Raab, 489 U.S. 656 (1989)).  "It is equally clear that the Fourth Amendment applies only to unreasonable searches and seizures."  Id. (citing Skinner, 489 U.S. at 619).  "What is reasonable 'depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself.'"  Id. (quoting Skinner, 489 U.S. at 619). Where an employee alleges that an employer's drug and/or alcohol testing policy was not followed and that the employer sought to have the employee submit to testing in the absence of

reasonable suspicion, "[i]t is [the employer's] violation of its own policy that allegedly renders the proposed search unreasonable." Dykes, 68 F.3d at 1568.

"Ultimately, the question of whether a particular search is reasonable for purposes of the Fourth Amendment is not a question of fact." Dykes, 68 F.3d at 1568 (citing Bolden v. Se. Pa. Transp. Auth., 953 F.2d 807, 822 (3d Cir. 1991) (en banc) ("Unlike a determination of 'reasonableness' in ordinary tort cases and some other contexts, this balancing process presents a question of law . . . ."), cert. denied, 504 U.S. 943 (1992)). In order to decide whether a search was reasonable, it must first be determined whether there was reasonable suspicion underlying an employer's request that an employee submit to testing. Dykes, 68 F.3d at 1568. "If there was reasonable suspicion, and [the employer], therefore, complied with the terms of its drug and alcohol testing policy, there is no Fourth Amendment issue; the policy, evaluated against the background of precedent, is reasonable in the broad constitutional sense." Id. The dispositive issue is thus whether an employer had reasonable suspicion to subject the employee to testing. Id.

"A search of a person is constitutional if the person freely and voluntarily consents." Bolden, 953 F.2d at 824 (citing Schneckloth v. Bustamonte, 412 U.S. 218, 219, 224 (1973)). Consent to search is a question of fact to be determined from the totality of the circumstances. Id. (citing Schneckloth, 412 U.S. at 226). Consent may be found involuntary if the consequence for refusing consent is the loss of employment. See Bolden, 953 F.2d at 825 ("Viewed in the light most favorable to the verdict, the evidence showed that [the plaintiff] submitted to drug testing without voicing any objection, not because he was truly willing to undergo the test, but because he understood that the test was compulsory and that the alternative to submission was

loss of his job—perhaps permanently or until after another round of potentially lengthy grievance proceedings or litigation.").

Defendant Bristol Township's policy regarding drug and alcohol testing for its employees includes the following guidelines:

> The required observations for alcohol and/or controlled substances reasonable suspicion testing must be based on specific contemporaneous, articulable observations concerning the appearance, behavior, speech, or body odors of the employee and must be made by a supervisor or manager who is trained in accordance with the following requirements:
>
> (a)  Supervisors/managers designated to determine whether reasonable suspicion exists to require an employee to undergo alcohol or controlled substance testing must receive at least one hour of training on alcohol misuse and at least one hour of training on controlled substances.
>
> (b)  The training provided by the contractor must cover the physical, behavioral, speech, and performance indicators of probable alcohol misuse and use of controlled substances.

(Pl.'s Resp. Opp'n Summ. J. 6; Ex. 7, Mar. 1, 2013 Settlement of Drug Testing Grievance.)

Defendants argue that Plaintiff's Fourth Amendment claims against Defendants McCauley and Swichar fail because Plaintiff "consented, without duress or coercion," to the Breathalyzer test. (Defs.' Mem. Supp. Mot. Summ. J. 11.)  According to Defendants, "Plaintiff's express acknowledgment that he was aware of his right to refuse the breathalyzer, but agreement to submit to it anyway rebuts any argument that his consent was not voluntary."  (Id. at 12.) Plaintiff maintains that Defendants did not have reasonable suspicion to require him to take a Breathalyzer test, and that he did not voluntarily consent to the test.  (Pl.'s Resp. Opp'n Summ. J.

15.)  Plaintiff asserts that his consent to the test was not voluntary because he knew that his employment could be terminated if he refused to take the test.  (Id. at 14 (citing Plaintiff Aff.).)[19]

The record evidence appears to support Plaintiff's view that Defendants did not have the contemporaneous, articulable reasonable suspicion required by Bristol Township's drug and alcohol testing policy at the time they administered a Breathalyzer test to Plaintiff, which undermines Defendants' Motion for Summary Judgment on the alleged Fourth Amendment violation.  In addition, because the issue of whether Plaintiff voluntarily consented to the test is in dispute, summary judgment as to Plaintiff's Fourth Amendment claims against Defendants McCauley and Swichar is not appropriate.  Accordingly, Defendants' Motion for Summary Judgment is denied with respect to Counts Two and Three.

### B.   Failure to Train in Violation of § 1983 (Count VII)

Plaintiff asserts that Defendant Bristol Township failed to instruct, supervise, control, or discipline Defendants McCauley and Swichar with regard to alcohol and drug testing of employees without reasonable suspicion and in violation of Plaintiff's rights.  (Am. Compl. ¶ 158.)  Plaintiff further alleges that Defendant Bristol Township "knew or should have known that its failure to provide [necessary] training" for testing "would predictably lead to violation of the constitutional rights of employees such as Plaintiff," and that Bristol Township was on notice of

---

[19] Defendants argue that the statements in Plaintiff's affidavit contradict his deposition testimony that he could refuse the test, but that he would take it.  (Defs.' Reply 1–2.)  Plaintiff's claim in his affidavit that he knew he could be fired if he refused to take the test does not contradict his deposition testimony that he could refuse—Plaintiff could technically refuse the test, but he would have faced serious consequences for refusing.

Defendants also argue that Plaintiff's Fourth Amendment claims fail because, even if the Court finds that consent was involuntary, "the alleged involuntariness of the consent was the result of Plaintiff's intention to follow union directives and not fear of the potential repercussions that could stem from his refusal to submit."  (Defs.' Reply 2.)  First, Defendants' argument is not persuasive for the reasons the Third Circuit Court of Appeals identified in Bolden v. SEPTA.  Second, the fact that Plaintiff may have acted on his union's advice to give involuntary consent rather than be fired does not automatically render the consent voluntary.  Accordingly, the Court rejects Defendants' arguments.

that possibility because of a prior settlement agreement related to random testing of employees. (Id. ¶ 159.)[20]

"[I]f a concededly valid policy is unconstitutionally applied by a municipal employee, the city is liable if the employee has not been adequately trained and the constitutional wrong has been caused by that failure to train." City of Canton v. Harris, 489 U.S. 378, 387 (1989). "[A] municipality can only be liable under § 1983 where the failure to train demonstrates a 'deliberate' or 'conscious' choice by the municipality." Doe v. Luzerne Cty., 660 F.3d 169, 179 (3d Cir. 2011) (citations omitted). "To determine whether a municipality's alleged failure to train its employees amounted to a deliberate or conscious choice, it must be shown that '(1) municipal policymakers know that employees will confront a particular situation; (2) the situation involves a difficult choice or a history of employees mishandling; and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights.'" Id. at 179–80 (citing Carter v. City of Phila., 181 F.3d 339, 357 (3d Cir. 1999) (additional citation omitted)). "Moreover, the identified deficiency in [the] training program must be closely related to the ultimate [constitutional] injury." Woloszyn v. Cty. of Lawrence, 396 F.3d 314, 325 (3d Cir. 2005) (internal citations and quotations omitted).

Defendants argue that they are entitled to summary judgment on Plaintiff's failure to train claim because Plaintiff's Amended Complaint did not "expose any official policies or customs of the Township that caused Plaintiff's alleged damages, and discovery has added no support for these claims." (See Defs.' Mem. Supp. Mot. Summ. J. 11–12.) This Court previously explained

---

[20] Plaintiff also alleged that Defendant Bristol Township approved or ratified the "unlawful, malicious, reckless, and wanton conduct of Defendants McCauley and Swichar." (Id. ¶ 162.) This Court previously found that this aspect of Plaintiff's claim in Count Seven was not supported by the factual allegations in the Complaint. See Cichonke v. Bristol Twp., No. Civ.A.14-4243, 2015 WL 1345439, at *9 n.15 (E.D. Pa. Mar. 25, 2015). At this time, Plaintiff has not submitted record evidence to support this allegation.

that while Plaintiff's factual allegations did not support a <u>Monell</u> claim based on an unconstitutional policy or custom, the Amended Complaint adequately stated a failure to train claim.  <u>See</u> <u>Cichonke</u>, 2015 WL 1345439, at *11.  Accordingly, the "policy or custom" case law on which Defendants rely does not dictate a finding of summary judgment in their favor with respect to Plaintiff's failure to train claim.[21]

Defendants next argue that there is "no evidence to support [Plaintiff's claim] that the Township failed to properly train Mr. Swichar and/or that the alleged failure to train led to any constitutional violations," because since "Plaintiff consented to the breathalyzer test, he cannot claim that he suffered any damages from this test."  (Defs.' Mem. Supp. Mot. Summ. J. 13; <u>see also</u> Defs.' Reply 3.)  First, as detailed above, there is record evidence that Defendant Swichar was not trained at all regarding the drug and alcohol testing policy.  Second, as discussed above in connection with Counts Two and Three, it is not clear that Plaintiff voluntarily consented to the Breathalyzer test.  Accordingly, Defendants' argument is not persuasive, and their Motion for Summary Judgment on Count Seven is denied.[22]

---

[21] Defendants also argue that "[t]he mere fact that one employee had not been trained on the Township's new 'policy' is insufficient to show that the Township engaged in a practice or custom of unauthorized tests."  (Defs.' Mem. Supp. Mot. Summ. J. 13.)  Again, Plaintiff's failure to train claim is concerned with whether Bristol Township failed to train its employees on the drug and alcohol testing policy, resulting in a violation of constitutional rights, not whether the policy or custom is itself unconstitutional.  Furthermore, the record evidence submitted by Plaintiff shows that no supervisors had received training on the drug and alcohol policy because Bristol Township had not "gotten around to it yet."  (See Pa. Labor Relations Bd. Hrg. Tr. 22:11–23:11.)

[22] Defendants assert in their Reply that because the drug and alcohol policy "is the result of a grievance" under the CBA, and because "similar alleged violations have been addressed through the grievance process[,]" Plaintiff must pursue a remedy under the CBA.  (Defs.' Reply 3.)  Defendants do not cite to any provision in the CBA which limits Plaintiff to the grievance process, or which purports to prohibit Plaintiff from seeking a remedy in federal court pursuant to § 1983 for the allegedly unconstitutional Breathalyzer test.  Accordingly, this argument is not persuasive.

C.     **FMLA Violations for Interference by Failing to Process Plaintiff's FMLA Documents (Counts VIII and IX)**

Plaintiff claims that Defendant Bristol Township, through Defendant McCauley, violated 29 U.S.C. § 2615(a)(1) by (a) refusing to accept Plaintiff's first submitted Certification of Employee's Serious Health Condition, "dismissing it as 'just' trigeminal neuralgia;" (b) failing to provide Plaintiff with written notification that it considered Plaintiff's First Certification incomplete and without indicating what additional information was necessary to make the certification complete and sufficient; (c) failing to sign and process Plaintiff's completed FMLA forms in a reasonable timeframe, thus causing unreasonable delay; (d) incorrectly informing Plaintiff that his FMLA documents had been properly handled and processed when his application was never processed; and (e) failing to notify Plaintiff of any defects in his Second Certification, and failing to notify him what additional information was necessary to make the certification complete and sufficient.  (Am. Compl. ¶¶ 172, 183.)

"In order to assert a claim of deprivation of entitlements, the employee only needs to show that he was entitled to benefits under the FMLA and that he was denied them."  Callison v. City of Phila., 430 F.3d 117, 119 (3d Cir. 2005) (citing 29 U.S.C. §§ 2612(a), 2614(a)).  The FMLA provides that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter."  29 U.S.C. § 2615(a)(1).  To assert an FMLA interference claim, "the employee need not show that he was treated differently than others."  Callison, 430 F.3d at 119.  "Further, the employer cannot justify its actions by establishing a legitimate business purpose for its decision."  Id. at 119–20.  Ultimately, "[a]n interference action is not about discrimination, it is only about whether the employer provided the employee with the entitlements guaranteed by the FMLA."  Id. at 120.

23

"To make a claim of interference under the FMLA, a plaintiff must establish: (1) he or she was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the defendant of his or her intention to take FMLA leave; and (5) the plaintiff was denied benefits to which he or she was entitled under the FMLA." Ross v. Gilhuly, 755 F.3d 185, 191–92 (3d Cir. 2014) (citations omitted).

As a preliminary matter, the record evidence indicates that Plaintiff's so-called "Second Certification" was not a second attempt to give notice to Defendants of Plaintiff's intention to take FMLA leave. Rather, that document was a doctor's note that is required, by both Bristol Township policy and the CBA, when an employee returns to work after three or more days of sick leave. Plaintiff submitted that form in connection with the sick leave he used in relation to a pulmonary embolism. Accordingly, Defendants' Motion for Summary Judgment is granted with respect to that element of Plaintiff's FMLA interference claims in Counts Eight and Nine.

With respect to the remaining aspects of Plaintiff's claims in Counts Eight and Nine, which concern his request for intermittent FMLA leave in connection with his trigeminal neuralgia, Defendants make several arguments in support of their Motion for Summary Judgment. The Court discusses each in turn and finds none of them to have merit.

First, Defendants argue that Plaintiff cannot establish a prima facie claim for FMLA interference because he did not provide sufficient evidence to prove that he suffered from a "serious health condition." (Defs.' Mem. Supp. Mot. Summ. J. 14.) According to Defendants, Plaintiff failed to establish that he had a serious health condition because he submitted an incomplete request for FMLA leave and did not resubmit his FMLA application, despite a request that he do so. (Id. at 15–17.)

24

The record evidence does not support Defendants' assertion that they successfully communicated a request to Plaintiff to resubmit his FMLA application.  As discussed above, deposition testimony, as well as testimony in other proceedings, shows that Plaintiff, and possibly also Paula Kearns, believed that Plaintiff's FMLA forms had been accepted and/or approved, that some of Plaintiff's time off was treated as FMLA leave, and that Defendant McCauley did not know whether Paula Kearns had ever communicated requests for more information to Plaintiff.  Nonetheless, Defendants argue that, "though [Paula Kearns] could not remember the specifics with regard to Plaintiff's FMLA application," Plaintiff must have received notice because her practice regarding an incomplete application would be to ask the employee to complete it.  (Defs.' Reply 4 (citing Kearn Dep. 24:11–24:18).)  Kearns's testimony creates a genuine issue of material fact in light of Plaintiff's testimony, but it does not entitle Defendants to summary judgment.

According to Defendants, Plaintiff knew that his first medical certification was incomplete because he alleged that he was informed that Defendant McCauley was not accepting his FMLA application.  (Id. at 3–4 (citing Am. Compl. ¶¶30–32).)  Defendants argue that Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment—in which Plaintiff argues that he did not know that Bristol Township considered his medical certification incomplete, and that he believed his request had been approved—"flies in the face" of the allegations in the Amended Complaint.  (Defs.' Reply 3–4 (citing Pl.'s Resp. Opp'n Summ. J. 20).)  But Plaintiff's complete allegation was that he was told that Defendant McCauley was not approving FMLA leave because Defendant McCauley did not believe that trigeminal neuralgia was a serious medical condition—not that the certification was incomplete or insufficient.  (See Am. Compl. ¶ 32.)  In other words, Plaintiff's Amended Complaint sets forth allegations

regarding Defendant McCauley's opinion of the seriousness of Plaintiff's medical condition, not Plaintiff's knowledge regarding the incompleteness of the medical certification.  Thus, the Amended Complaint is not in conflict with Plaintiff's current arguments.

Notably, the record evidence submitted in conjunction with the parties' briefs does not establish that *written* notice regarding the inadequacy of Plaintiff's FMLA application was provided to him.  "[I]n 'any circumstance where the employer does not have sufficient information about the reason for an employee's use of leave, the employer should inquire further of the employee . . . to ascertain whether leave is potentially FMLA-qualifying.'"  Hansler v. Lehigh Valley Hosp. Network, 798 F.3d 149, 153 (3d Cir. 2015) (quoting 29 C.F.R. § 825.301(a)).  "In addition, an employer 'shall advise an employee whenever the employer finds a certification incomplete or insufficient, and shall state *in writing* what additional information is necessary to make the certification complete and sufficient.'"  Id. (quoting 29 C.F.R. § 825.305(c)) (emphasis added).  "A certification is 'incomplete' if the 'employer receives a certification, but one or more of the applicable entries have not been completed.'"  Id. (quoting 29 C.F.R. § 825.305(c)).  The Third Circuit Court of Appeals held "that when a certification submitted by an employee is 'vague, ambiguous, or non-responsive' (or 'incomplete,' for that matter) as to any of the categories of information required under 29 U.S.C. § 2613(b), the employer 'shall advise [the] employee . . . what additional information is necessary to make the certification complete and sufficient' and 'must provide the employee with seven calendar days . . . to cure any such deficiency.'"  Id. at 155 (quoting 29 C.F.R. § 825.305(c)).  In other words, written notice to an employee must (1) advise the employee that the application and/or medical certification was insufficient, (2) state in writing what additional information is necessary to make such documents sufficient, and (3) provide the employee with an opportunity to cure

before denying the leave request.  Id. at 156 (citing 29 C.F.R. § 825.305(c)).  Thus, if a plaintiff

can prove that he was denied benefits to which he was otherwise entitled, that plaintiff may

premise an FMLA interference claim on an alleged regulatory violation of failure to provide

written notice and an opportunity to cure.  Id. at 156.

This Court previously found that Plaintiff had sufficiently pled entitlement to FMLA

benefits based on the dates and circumstances of his employment, and that he had sufficiently

alleged that he was denied those benefits.  See Cichonke, 2015 WL 1345439, at *12–13.

Defendants now assert that "[e]ven if Plaintiff was not notified in writing, this mere technicality

does not preclude summary judgment, particularly where Defendant has otherwise satisfied the

notice and opportunity to cure requirement."  (Defs.' Reply 5.)  In light of the Third Circuit's

decision in Hansler, however, this argument is simply incorrect.  Based on Plaintiff's various

forms of testimony that he never received the statutorily-required written notice from Defendants

that his FMLA leave application was incomplete, and the absence of record evidence

establishing that Defendants provided the statutorily-required written notice and opportunity to

cure, Defendants are not entitled to summary judgment on these claims.

Defendants also assert that Plaintiff's FMLA interference claims fail because Plaintiff

"never provided notice of his intention to take FMLA leave or that any of the days he called off

sick were related to his prior request for FMLA leave."  (Defs.' Mem. Supp. Mot. Summ. J. 18.)

Defendants also rely on Plaintiff's inability to recall at his deposition whether the reason he

called out sick on June 17, 2013 and June 18, 2013 was because of his trigeminal neuralgia.  (Id.

citing Plaintiff Dep. 86:24–88:7).)  Plaintiff, however, believed that at least some of his sick

leave was being treated as FMLA leave, and testified previously that Paula Kearns told him his

sick leave was being designated as FMLA leave.  (See Pl.'s Resp. Opp'n Summ. J. 4;

Unemployment Compensation Appeal Tr. at 18.)  Moreover, it appears likely that Plaintiff somehow communicated that his sick time needs were related to his trigeminal neuralgia because Paula Kearns sent an email to Defendant Swichar regarding Plaintiff which said "[e]mployee continues on FMLA."  (See McCauley Dep. 70:21–73:1.)  Thus, material issues of fact remain as to whether and what kind of notice Plaintiff provided to his employer with respect to actually taking FMLA leave.

Finally, Defendants argue that Plaintiff was not actually denied any benefits because (1) he voluntarily retired without ever correcting his incomplete FMLA form for trigeminal neuralgia; and (2) he was permitted to apply vacation time to the days he was out due to a pulmonary embolism.  (Defs.' Mem. Supp. Mot. Summ. J. 18.)  Plaintiff's submissions, however, successfully rebut these contentions.  First, Plaintiff has alleged that his retirement amounts to a constructive discharge.  Second, Plaintiff maintains that he never had written notice that his forms were incomplete, and thus was not aware that he needed to submit corrected or completed forms.  Third, the fact that Defendants permitted Plaintiff to use vacation time for leave that he needed for the treatment of a medical condition unrelated to his trigeminal neuralgia does not mean that Plaintiff was not denied FMLA benefits related to his trigeminal neuralgia.  Accordingly, Defendants' arguments do not entitle them to summary judgment on Plaintiff's FMLA interference claims.

In light of the above discussion, Defendants' Motion for Summary Judgment on Plaintiff's FMLA interference claims in Counts Eight and Nine must be denied.

**D.** **FMLA Violations for Interference by Counting FMLA-Qualifying Leave Against Plaintiff (Counts X and XI)**

Plaintiff claims that Defendant Bristol Township and Defendant Swichar violated 29 U.S.C. § 2615(a)(1) by (a) giving Plaintiff a letter informing him that he had exhausted his sick

leave, that his sick leave had not been approved, and that he must report to work or face disciplinary action or discharge; (b) failing to provide Plaintiff with written notification that his First and Second Certifications were incomplete and failing to inform him about what additional information was necessary, as required by 29 C.F.R. § 825.305(c); and (c) by counting FMLA-qualifying leave against Plaintiff for purposes of disciplinary action and termination.  (Am. Compl. ¶¶ 188, 189–193, 197, 198–202.)

Both Defendants and Plaintiff relied on the same arguments for each of Plaintiff's FMLA interference claims.  Thus, for the reasons discussed above, Defendants' Motion for Summary Judgment is denied as to Counts Ten and Eleven, except with respect to those claims related to the so-called Second Certification, for which Defendants' Motion for Summary Judgment is granted.

### E.  FMLA Violations for Interference in Violation of 29 U.S.C. 2615(a)(1) (Counts XII and XIII)

Plaintiff alleges that Defendant Bristol Township and Defendant William McCauley violated 29 U.S.C. § 2615(a)(1) by requiring Plaintiff to obtain a Second Certification of Employee's Serious Health Condition, failing to inform Plaintiff in writing that the First Certification was insufficient or incomplete, and by not providing Plaintiff with written notification of what additional information would be needed to make the certification complete and sufficient, as is required by 29 C.F.R. § 825.307(b)(1).  (Am. Compl. ¶¶ 206–213, 217–223.) Plaintiff further alleges that Defendant Bristol Township did not cover the costs Plaintiff incurred in obtaining a Second Certification.  (Id. ¶ 224.)

29 C.F.R. § 825.307(b)(1) provides that:

> An employer who has reason to doubt the validity of a medical certification may require the employee to obtain a second opinion at the employer's expense. Pending receipt of the second (or third)

29

> medical opinion, the employee is provisionally entitled to the benefits of the Act, including maintenance of group health benefits. If the certifications do not ultimately establish the employee's entitlement to FMLA leave, the leave shall not be designated as FMLA leave and may be treated as paid or unpaid leave under the employer's established leave policies.

29 C.F.R. § 825.307.[23]

As discussed above, the record evidence indicates that the "Second Certification" is in fact a doctor's note that Plaintiff was required to submit in order to return to work after missing more than three days in connection with his hospitalization and treatment for a pulmonary embolism, and is wholly unrelated to his application for FMLA leave due to trigeminal neuralgia. Accordingly, Defendants' Motion for Summary Judgment is granted with respect to those aspects of Plaintiff's claims in Counts Twelve and Thirteen which allege FMLA interference on the basis of requiring a second certification and for not covering the costs of a second certification. To the extent that Counts Twelve and Thirteen state FMLA interference claims against Defendant Bristol Township and Defendant McCauley on the basis of statutory violations in connection with the first medical certification Plaintiff submitted with his application for FMLA leave, Defendants' Motion for Summary Judgment is denied for the reasons discussed above in connection with Counts Eight, Nine, Ten, and Eleven.

**F.      FMLA Violations for Retaliation (Counts XIV, XV, and XVI)**

Plaintiff's final category of FMLA claims allege retaliation in violation of 29 U.S.C. § 2615(a)(2) against Defendants Bristol Township, McCauley, and Swichar for taking adverse action against Plaintiff based on his request for and/or use of FMLA leave. (Am. Compl. ¶¶

---

[23] See also 29 U.S.C.A. § 2613 ("In any case in which the employer has reason to doubt the validity of the certification provided under subsection (a) of this section for leave under subparagraph (C) or (D) of section 2612(a)(1) of this title, the employer may require, at the expense of the employer, that the eligible employee obtain the opinion of a second health care provider designated or approved by the employer concerning any information certified under subsection (b) of this section for such leave.").

231–32, 240–41, 251–52.)  Plaintiff alleges that (1) Defendants Bristol Township and McCauley harassed Plaintiff about the severity of his condition, including telling Plaintiff that he would not be approved for FMLA leave for "just" trigeminal neuralgia, and by requiring him to obtain a Second Certification; (2) all Defendants conducted undue and harassing surveillance of Plaintiff; (3) all Defendants forced Plaintiff to undergo an unnecessary and baseless Breathalyzer test during work hours "for the purpose of harassment;" (4) all Defendants threatened Plaintiff with disciplinary action or discharge for using FMLA leave, and (5) Defendant McCauley refused to provide written notice to Plaintiff that his FMLA application was incomplete and that additional information was necessary to make it complete and sufficient.  (Id. ¶¶ 231, 240, 251.)  Plaintiff alleges further that the conditions of his employment became so intolerable that a reasonable person in Plaintiff's situation would be forced to resign, and that, under the circumstances, Plaintiff's resignation on June 18, 2013 was involuntary and amounted to a constructive discharge.  (Id. ¶¶ 233–34, 242–43, 253–254.)

The FMLA provides that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter and that "[i]t shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(1)–(2).  "Because FMLA retaliation claims require proof of the employer's retaliatory intent, courts have assessed these claims through the lens of employment discrimination law.  Accordingly, claims based on circumstantial evidence have been assessed under the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), while claims based on direct evidence have been assessed under the mixed-motive framework set forth in Price Waterhouse v. Hopkins, 490 U.S. 228, 276–77 (1989)

(O'Connor, J., concurring)."  Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 302

(3d Cir. 2012).  In this case, both parties have structured their arguments based on the burden-

shifting framework applied to claims based on circumstantial evidence.

Under the McDonnell Douglas model, the plaintiff is first required to set forth sufficient

evidence to establish a prima facie case.  "Under that familiar test, the plaintiff must first

establish a prima facie case of discrimination by showing that: (1) s/he is a member of a

protected class; (2) s/he was qualified for the position s/he sought to attain or retain; (3) s/he

suffered an adverse employment action; and (4) the action occurred under circumstances that

could give rise to an inference of intentional discrimination.  Makky v. Chertoff, 541 F.3d 205,

214 (3d Cir. 2008) (citing McDonnell Douglas, 411 U.S. at 802; Sheridan v. E.I. DuPont de

Nemours & Co., 100 F.3d 1061, 1066 n.5 (3d Cir. 1996) (en banc)).  "[T]he elements of a prima

facie case depend on the facts of the particular case."  Jones v. Sch. Dist. of Phila., 198 F.3d 403,

411 (3d Cir. 1999).  To establish a prima facie case of retaliation under FMLA, Plaintiff must

show that "(1) []he invoked [his] right to FMLA-qualifying leave, (2) []he suffered an adverse

employment decision, and (3) the adverse action was causally related to [his] invocation of

rights."  Lichtenstein, 691 F.3d at 302.

Once a prima facie case is established, the second stage shifts the burden of production to

the defendant wherein the defendant must produce evidence sufficient to support a finding that

there was a legitimate, nondiscriminatory reason for the employment action.  St. Mary's Honor

Ctr. v. Hicks, 509 U.S. 502, 506–07 (1993).  The burden on the defendant at this juncture is

"relatively light," and the defendant can satisfy it "by introducing evidence which, taken as true,

would permit the conclusion that there was a non-discriminatory reason for the unfavorable

employment decision."  Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994).  "The employer

need not prove that the tendered reason actually motivated its behavior, as through this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff."  Id.

Once the defendant articulates such reasons, the burden reverts back to the plaintiff, who must show by a preponderance of the evidence that those legitimate reasons were a pretext for discrimination.  Fuentes, 32 F.3d at 763.  In order to defeat a summary judgment motion, the plaintiff must produce evidence which would allow a factfinder "reasonably to infer that each of the employer's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)."  Id. (internal citations omitted); see also Robinson v. Matthews Int'l Corp., No. Civ.A.09–1965, 2010 WL 763869, at *3 (3d Cir. Mar. 8, 2010).  To discredit the employer's proffered reason . . . the plaintiff cannot simply show that

> the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent.  Rather, the nonmoving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence.

Fuentes, 32 F.3d at 765.  In other words, "the question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is discrimination."  Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1109 (3d Cir. 1997) (quoting Carson v. Bethlehem Steel Corp., 83 F.3d 157, 159 (7th Cir. 1996)).

In an effort to further define the boundaries of the pretext inquiry at the summary judgment stage, the United States Court of Appeals for the Third Circuit has emphasized that the plaintiff must "point to some evidence, direct or circumstantial, from which a fact-finder could

reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes, 32 F.3d at 764.  Under the first method, the plaintiff must, as noted above, "demonstrate such weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact-finder could rationally find them 'unworthy of credence' and hence infer that 'the employer did not act for [the asserted] non-discriminatory reasons.'"  Id. (internal citations omitted); see also Gilbert v. Phila. Media Holdings, 564 F. Supp. 2d 429, 434 (E.D. Pa. 2008).  Unless there is evidence of discrimination, the court is permitted neither to get involved in the subjective business decisions of the employer, nor to set its own employment standards for the employer.  See Ezold v. Wolf, Block, Schorr & Solis–Cohen, 983 F.2d 509, 527 (3d Cir. 1992).

"Alternatively, through the second method outlined in Fuentes to prove that the defendant's proffered legitimate and non-discriminatory reason is merely pretext, a plaintiff could show that invidious discrimination was more likely than not a motivating or determinative factor in the defendant's adverse employment action."  Gilbert, 564 F. Supp. 2d at 434 (citing Fuentes, 32 F.3d at 764).  In other words:

> the plaintiff must point to evidence with sufficient probative force that a factfinder could conclude by a preponderance of the evidence that [the protected characteristic] was a motivating or determinative factor in the employment decision.  For example, the plaintiff may show that the employer has previously discriminated against [him or her], that the employer had discriminated against other persons within the plaintiff's protected class or within another protected class, or that the employer has treated more favorably similarly situated persons not within the protected class.

Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 644–45 (3d Cir. 1998) (internal

citations omitted).

### 1.  **Prima Facie case**

Defendants argue that Plaintiff cannot establish a prima facie case of retaliation because: (1) Plaintiff cannot assert that he invoked an FMLA right because he never established that he was entitled to intermittent FMLA leave; (2) Plaintiff voluntarily retired from his position on June 18, 2013, has not established that he was constructively discharged "beyond the bald allegations in his Amended Complaint," and cannot establish a causal link between his retirement and request for FMLA leave; and (3) Plaintiff has not adduced evidence to support the other alleged adverse employment actions[24] set forth in the Amended Complaint.  (Defs.' Mem. Supp. Mot. Summ. J. 19–20, 21.)  The Court will address each of Defendants' arguments in turn.

### a.  **Whether Plaintiff Invoked His Right to FMLA Leave**

In response to Defendants' argument that he never established his entitlement to intermittent FMLA leave, Plaintiff first asserts that he invoked his right to FMLA leave "when he explained his medical condition to Paula Kearns, she advised him to take intermittent FMLA leave, he filled out the application with Kearns' help, and [he] submitted it as instructed by Kearns."  (Pl.'s Resp. Opp'n Summ. J. 24 (citing Plaintiff Dep. 33:24–34:12, 34:3–21, 35:7–36:17; 37:15).)  Plaintiff next argues that Defendants' contention that Plaintiff never established his entitlement to FMLA leave because his medical certification was incomplete is faulty,

---

[24] The other alleged adverse employment actions are (1) telling Plaintiff that his FMLA leave request would not be approved for "just" trigeminal neuralgia and requiring Plaintiff to obtain a Second Certification; (2) conducting harassing surveillance of Plaintiff; (3) forcing Plaintiff to submit to a Breathalyzer test; (4) refusing to provide Plaintiff with notice that his FMLA application was incomplete; and (5) threatening Plaintiff with disciplinary action or discharge for using FMLA-eligible leave.  (See Defs.' Mem. Supp. Mot. Summ. J. 20.)

because Plaintiff never received written notice of any deficiency as required by statute.  (Id. at 24 n.52.)

"An employee giving notice of the need for FMLA leave does not need to expressly assert rights under the Act or even mention the FMLA to meet his or her obligation to provide notice, though the employee would need to state a qualifying reason for the needed leave and otherwise satisfy the notice requirements set forth in § 825.302 or § 825.303 depending on whether the need for leave is foreseeable or unforeseeable."  29 C.F.R. § 825.301(b).  "When an employee seeks leave for the first time for a FMLA-qualifying reason, the employee need not expressly assert rights under the FMLA or even mention the FMLA."  29 C.F.R. § 825.302(c).  "An employee shall provide at least verbal notice sufficient to make the employer aware that the employee needs FMLA-qualifying leave, and the anticipated timing and duration of the leave.  Depending on the situation, such information may include that a condition renders the employee unable to perform the functions of the job . . . ."  Id.  "An employee has an obligation to respond to an employer's questions designed to determine whether an absence is potentially FMLA-qualifying.  Failure to respond to reasonable employer inquiries regarding the leave request may result in denial of FMLA protection if the employer is unable to determine whether the leave is FMLA-qualifying."  Id.  "[A]n employer may require that written notice set forth the reasons for the requested leave, the anticipated duration of the leave, and the anticipated start of the leave.  Where an employee does not comply with the employer's usual notice and procedural requirements, and no unusual circumstances justify the failure to comply, FMLA-protected leave may be delayed or denied."  29 C.F.R. § 825.302(d).

Under this standard, Defendants' claim that Plaintiff never invoked his right to FMLA leave must fail.  First, Plaintiff gave his employer notice of his FMLA request, both when he

spoke with Paula Kearns and when he submitted the Bristol Township FMLA application and the accompanying medical certification. The fact that Defendants considered his medical certification incomplete does not erase the actions Plaintiff took to notify his employer that he wished to apply for FMLA leave. Second, as discussed above, Plaintiff was not provided the required written notice and seven day opportunity to cure any deficiencies in the medical certification that Defendants deemed incomplete. Whether Plaintiff had other communications from his employer regarding the certification is disputed. The first element of a prima facie case of FMLA retaliation merely requires Plaintiff to establish that he invoked his right to FMLA leave, which he did by giving notice of his need for leave to his employer. Accordingly, Defendants' argument regarding the first element of a prima facie case is not persuasive.

### b. **Whether Plaintiff Suffered Adverse Employment Actions**

The second element of a prima facie case of FMLA retaliation requires Plaintiff to show that he suffered adverse employment actions. As stated above, Defendants argue that Plaintiff was not constructively discharged because he voluntarily retired from his position on June 18, 2013, and that he has not adduced evidence to support the other alleged adverse employment actions, specifically that Defendants: (1) told Plaintiff that his FMLA leave request would not be approved for "just" trigeminal neuralgia and required Plaintiff to obtain a Second Certification; (2) conducted harassing surveillance of Plaintiff; (3) forced Plaintiff to submit to a Breathalyzer test; (4) refused to provide Plaintiff with notice that his FMLA application was incomplete; and (5) threatened Plaintiff with disciplinary action or discharge for using FMLA-eligible leave. (See Defs.' Mem. Supp. Mot. Summ. J. 20.) It is not entirely clear from the manner in which Plaintiff structured his argument whether each individual act is still alleged to be a stand-alone adverse employment action, or whether Plaintiff now only asserts that they were part of the

ongoing acts of antagonism which led to his constructive discharge.  Based on the phrasing of the Amended Complaint, the Court will proceed as though Plaintiff still intends to claim that each event was a retaliatory act in violation of the FMLA, and that together they led to his constructive discharge.

An adverse employment action is "an action by an employer that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." Storey v. Burns Int'l Sec. Servs., 390 F.3d 760, 764 (3d Cir. 2004), as amended (Dec. 20, 2004) (quotations omitted).  The Court now turns to a discussion of each of the alleged adverse employment actions.

### i.      The Individual Events

#### a.   "Just" Trigeminal Neuralgia and the Second Certification

Plaintiff makes no argument in support of his allegation that Defendant McCauley refused to approve his FMLA application because it was for "just" trigeminal neuralgia and that he was required to obtain a second medical certification.  Plaintiff does not point to any record evidence to establish that Defendant McCauley made that particular remark about trigeminal neuralgia.  As discussed above, the so-called second certification was actually a doctor's note in connection with a separate medical condition for which Plaintiff received treatment, and which was required by Township Policy and the CBA in order for Plaintiff to return to work following three or more sick days.  Thus, Plaintiff's allegation is not supported by the record evidence, either on its own or as part of any alleged ongoing antagonism.  Accordingly, Defendants are entitled to summary judgment as to this aspect of Plaintiff's FMLA retaliation claims.

### b.  **Harassing Surveillance**

Defendants do not make any specific argument in support of their Motion for Summary

Judgment as to whether the trip to the VFW by Defendant Swichar and Paula Kearns was an

adverse employment action.  Plaintiff argues that their "surveillance" was an adverse

employment action, because (1) it caused him to feel threatened, because an accusation of

drinking could have resulted in his termination; and (2) Defendants later used his presence at the

VFW on June 6, 2013 as the basis for the Breathalyzer test Plaintiff took on June 10, 2013.

(Pl.'s Resp. Opp'n Summ. J. 29.)  As discussed above, there are factual discrepancies regarding

Defendants' motivations for sending Defendant Swichar and Paula Kearns to the VFW to look

for Plaintiff.  Based on the current evidence of record, it is possible that a reasonable jury could

find that such conduct was an adverse employment action.  Accordingly, summary judgment as

to whether the "surveillance" was an adverse employment action is inappropriate.

### c.  **Breathalyzer Test**

Plaintiff asserts that requiring him to take a Breathalyzer test on June 10, 2013 was an

adverse employment action because he would have been subject to discipline or discharge if he

refused to take the test, and because the test was given in the absence of reasonable suspicion and

in violation of his Fourth Amendment rights.  (Pl.'s Resp. Opp'n Summ. J. 28.)  Plaintiff argues

that a jury could find that the test constituted retaliation for invoking his FMLA rights, because it

was administered on Plaintiff's first day back at work after using FMLA leave.  (Id.)  Defendants

argue only that Plaintiff voluntarily consented to the test, and that he was not actually forced to

take it.  (Defs.' Mem. Supp. Mot. Summ. J. 21.)  Because the issue of whether Plaintiff

voluntarily consented to the test is disputed by the parties, and because a rational jury could find

that subjecting Plaintiff to an alcohol test in violation of Bristol Township policy was an adverse employment action, summary judgment as to whether the Breathalyzer test constituted an adverse employment action is inappropriate.

### d.   Failure to Provide Notice of Incomplete FMLA Application

Plaintiff did not address his allegation that Defendant McCauley retaliated against him by failing to provide him with notice of his incomplete FMLA application in those portions of his briefs regarding his FMLA retaliation claims.  (Am. Compl. ¶ 251.)  Defendants argue simply that Plaintiff adduced no evidence to support his contentions of this, or any other, adverse employment action.  (See Defs.' Mem. Supp. Mot. Summ. J. 20.)  This conclusory assertion does not establish the absence of an issue of material fact as to whether Defendant McCauley's failure constituted retaliation.  Neither party has provided satisfactory briefing on whether this allegation may support both Plaintiff's FMLA interference claims and an FMLA retaliation claim against Defendant McCauley, in the context of an individual adverse employment action, as opposed to in connection with termination of employment via constructive discharge.[25] Therefore, in spite of the fact that Plaintiff did not include Defendant McCauley's alleged failure to provide written notice as part of his constructive discharge claim, and did not reference that allegation in connection with the FMLA retaliation portion of his briefs in opposition to summary judgment, the Court declines to grant Defendants' Motion for Summary Judgment as to this aspect of Plaintiff's FMLA retaliation claims.

---

[25] The Third Circuit has stated that "we interpret the requirement that an employee 'take' FMLA leave to connote invocation of FMLA rights, not actual commencement of leave." Erdman v. Nationwide Ins. Co., 582 F.3d 500, 509 (3d Cir. 2009).  Thus, "firing an employee for a valid request for FMLA leave may constitute interference with the employee's FMLA rights as well as retaliation against the employee."  Id.

### e.   Threat of Disciplinary Action or Discharge

The next alleged adverse employment action concerns the June 18, 2013 letter that Defendant Swichar delivered to Plaintiff.  Defendants first argue that Plaintiff never sought to take FMLA leave on June 17, 2013 or June 18, 2013, and that he was unable to recall if the reason he called out sick on those days was because of his trigeminal neuralgia.  (Defs.' Mem. Supp. Mot. Summ. J. 20 (citing Plaintiff Dep. 87:1–20, 88:1–7).)  To be precise, however, Plaintiff testified at his deposition that, as to June 17, 2013, he did not remember if it was his jaw, but that he believed it was his jaw acting up, and that he did not remember why he called in sick on June 18, 2013.  (Plaintiff Dep. 87:4–5, 88:3–7.)  The mere fact that Plaintiff could not recall, approximately one-and-a-half years later, whether he called out sick on those days due to his jaw does not conclusively prove that Plaintiff was not attempting to use intermittent FMLA leave on those days, or that Defendants did not think that Plaintiff was attempting to use FMLA leave.  In fact, the emails exchanged among Defendant McCauley, Defendant Swichar, and Kate Murphy on June 18, 2013 indicate that Defendants believed that Plaintiff thought he was using FMLA leave on those dates.  (See Pl.'s Exs. 12–14.)

The Third Circuit has previously remarked on "the language of 29 C.F.R. § 825.303(a), which provides that 'where the employer does not have sufficient information about the reason for an employee's use of leave, *the employer* should inquire further of the employee . . . to ascertain whether leave is potentially FMLA-qualifying.'"  Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 303 (3d Cir. 2012).  "The regulations thus clearly envision situations where an employee can satisfy her notice obligation without providing enough detailed information for the employer to know if FMLA actually applies."  Id.  "How the employee's notice is reasonably interpreted is generally a question of fact, not law."  Id. (citations omitted).

41

Accordingly, genuine issues of material fact remain as to (1) whether Plaintiff believed he was using FMLA leave on the relevant dates; (2) whether Plaintiff's notice was sufficient or whether Defendants should have enquired further about how Plaintiff's leave should be characterized; and (3) whether Defendants acted in retaliation for Plaintiff's intention or attempts to use FMLA leave.

Defendants next argue that "[n]o evidence exists that Plaintiff was threatened with discipline or discharge for using 'eligible' FMLA leave" and that "[i]nstead, Plaintiff was notified that he had exhausted his sick leave and [that] continued failure to appear at work would result in discipline up to and including discharge."  (Defs.' Mem. Supp. Mot. Summ. J. 20–21.) If, however, Defendants had provided Plaintiff with written notice and an opportunity to cure his incomplete FMLA application, as is required by statute, Plaintiff would not have been operating under the impression that he was using FMLA leave while Defendants apparently continued treating Plaintiff's absences as ordinary sick leave.  As discussed above, the record evidence submitted by the parties does not establish that Plaintiff was provided with such notice, either verbally or in writing.  Accordingly, given the absence of notice by Defendants, any failure by Plaintiff to revise his FMLA application cannot establish the lack of an adverse employment action for purposes of an FMLA retaliation claim.  Furthermore, it is not clear whether and why some of Plaintiff's absences were counted as FMLA leave, while other days were counted as sick leave.  Thus, a reasonable jury could find that the June 18, 2013 letter was an adverse employment action.

### f.  <u>Withholding Vacation Pay</u>

Plaintiff next asserts that Defendants took adverse employment action against him by withholding payment of his accrued and unused vacation time until nearly two years after his last

day of work, and that "[w]ithholding the vacation pay constituted withholding Plaintiff's wages, which was a serious and tangible consequence altering Plaintiff's anticipated compensation." (Pl.'s Resp. Opp'n Summ. J. 30.)  According to Plaintiff, "[t]he payment of accrued vacation time came on the heels of the adverse acts [described in Plaintiff's brief] including Plaintiff's constructive discharge . . . ."  (Pl.'s Resp. Opp'n Summ. J. 31.)  Plaintiff asserts that "[i]n the absence of any legitimate reason for delaying the payment to Plaintiff, a reasonable inference can be made that withholding Plaintiff's vacation pay was another act of retaliation reflecting Defendants' animus for Plaintiff's use of FMLA-eligible leave."  (Id.)[26]

In support of his argument, Plaintiff cites Lupyan v. Corinthian Colleges for the proposition that "FMLA protects employees against retaliation even after the employee has returned from FMLA leave."  (Pl.'s Resp. Opp'n Summ. J. 30 n.64.)  In that case, the Third Circuit stated that "'[t]he FMLA's protection against retaliation is not limited to periods in which an employee is on FMLA leave, but encompasses the employer's conduct both during and after the employer's FMLA leave.'"  Lupyan v. Corinthian Colleges Inc., 761 F.3d 314, 324–25 (3d Cir. 2014) (quoting Hunt v. Rapides Healthcare Sys., LLC, 277 F.3d 757, 768–69 (5th Cir. 2001)).  "The nature of retaliation claims distinctly focuses on the employer's conduct and motivations for termination.  Therefore, an employee is not precluded—as a matter of law—from bringing a retaliation claim simply because she exceeded the twelve-week FMLA entitlement." Lupyan, 761 F.3d at 235 (citation omitted).

Defendants did not address this issue in their briefs.  Plaintiff did not clearly delineate how and whether Lupyan should apply to the facts of this case, nor did he adequately brief the

---

[26] Defendants did not make a specific argument regarding this alleged adverse employment action in their Memorandum of Law, presumably because it was not specifically identified in Plaintiff's Amended Complaint as part of his retaliation claims.  Moreover, Defendants did not specifically address Plaintiff's arguments as to this allegation in their Reply.

issue of whether the withheld vacation pay can constitute part of the ongoing acts of antagonism leading to constructive discharge.  In light of these omissions in the parties' briefs, the Court declines to grant summary judgment to Defendants on this aspect of Plaintiffs' retaliation claims.

### ii. Whether the Above Actions, Viewed Together, Constitute Ongoing Antagonism Resulting in Constructive Discharge

As stated above, Plaintiff alleges that certain of the individual adverse employment actions the Court has just discussed also constitute acts of ongoing antagonism that led to his constructive discharge.  "To find constructive discharge, a court 'need merely find that the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign.'"  Lebofsky v. City of Phila., 394 F. App'x 935, 939 (3d Cir. 2010) (quoting Goss v. Exxon Office Sys. Co., 747 F.2d 885, 888 (3d Cir. 1984)).

Defendants argue that Plaintiff voluntarily retired on June 18, 2013, and that he cannot identify evidence to support his allegations "that conditions of discrimination existed at all, let alone identify conditions" that satisfy the legal standard for finding constructive discharge. (Defs.' Mem. Supp. Mot. Summ. J. 19–20.)  Plaintiff responds that there was a period of ongoing acts of antagonism that began with his invocation of FMLA rights and that continued up to and after June 18, 2013, which rendered the conditions of his employment so intolerable that a reasonable person in his situation would be forced to resign.  (Pl.'s Resp. Opp'n Summ. J. 25.) Plaintiff identifies four specific incidents which were part of this period of ongoing acts of antagonism:  (1) the June 18, 2013 letter that ordered Plaintiff to return to work or face discipline or discharge; (2) the June 10, 2013 Breathalyzer test that Defendants required Plaintiff to take; (3) surveillance of Plaintiff at the VFW on June 6, 2013; and (4) withholding Plaintiff's accrued and unused vacation pay for a period of nearly two years.  (Id. at 25–31.)

As discussed more thoroughly above, a reasonable jury could find that these events constitute adverse employment actions. Thus, based on the record evidence submitted in this case, Plaintiff has identified conduct by Defendants that, when viewed as a series of events, could be found to be so intolerable that a reasonable person would be forced to resign.

### c.  Whether the Adverse Employment Actions Were Causally Related to Plaintiff's Invocation of FMLA Rights

"To demonstrate a prima facie case of causation, [a plaintiff] must point to evidence sufficient to create an inference that a causative link exists between [the] FMLA leave and [the] termination." Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 307 (3d Cir. 2012) (citing Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279–81 (3d Cir. 2000)). "When the 'temporal proximity' between the protected activity and adverse action is 'unduly suggestive,' this 'is sufficient standing alone to create an inference of causality and defeat summary judgment.'" Id. (quoting LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 232 (3d Cir. 2007)). "Where the temporal proximity is not 'unusually suggestive,' [courts must] ask whether 'the proffered evidence, looked at as a whole, may suffice to raise the inference.'" Id. (quoting Leboon, 503 F.3d at 232) (additional citation omitted)).

Defendants first argue that Plaintiff has not established evidence to support his assertions that he suffered from adverse employment actions because of his request for FMLA leave, or that he was constructively discharged. (Defs.' Mem. Supp. Mot. Summ. J. 21.) According to Defendants, there is insufficient temporal proximity because "Plaintiff submitted his incomplete FMLA application four months prior to his voluntary retirement . . . [and thus] the alleged timing is not 'unusually suggestive' of a retaliatory motive.'" (Id.) In support of that assertion, Defendants cite a case in which the court found that a time period of two months between the plaintiff's last use of FMLA leave and her termination was too long to show causation between

protected activity and retaliation.  (See id. (citing Allen v. Nutrisystem, Inc., No. Civ.A.11-4107,

2013 WL 1776440, at *8 (E.D. Pa. Apr. 25, 2013) aff'd, 546 F. App'x 98 (3d Cir. 2013)).)

Defendants' argument is misleading, however, because while the total time between Plaintiff's

initial FMLA application and June 18, 2013 is approximately four months, each event that

Plaintiff asserts was an adverse employment action occurred within a matter of days, or at most

weeks, of his use of leave.  Genuine issues of material fact remain regarding whether Plaintiff

was using leave for trigeminal neuralgia or for other reasons, whether he believed he was using

sick time or FMLA time, whether Defendants intentionally treated Plaintiff's absences as sick

time as opposed to FMLA time after failing to give Plaintiff written notice that he needed to

correct his FMLA application, and whether Plaintiff voluntarily retired or was constructively

discharged.  Accordingly, summary judgment would not be appropriate on the basis of

Defendants' argument that there is no "unduly suggestive" temporal proximity between

Plaintiff's initial application for FMLA leave and his last day of work.

Defendants next argue that Plaintiff has not shown that the alleged adverse employment

actions were causally connected to his FMLA application, as opposed to being caused by "his

admittedly strained relationship with the leadership in Bristol Township."  (Defs.' Reply 5

(citing Plaintiff Dep. 56:15–56:21).)  According to Defendants, "the evidence of record shows

that Plaintiff's poor working relationship with [Defendant Swichar] began prior to his request for

FMLA leave and arose mainly out of disagreements to the CBA agreement."  (Defs.' Mem.

Supp. Mot. Summ. J. 21.)   At his deposition, Plaintiff testified that his working relationship

with Defendant Swichar was "[n]ot good."  (Plaintiff Dep. 56:15–17.)  When asked whether the

relationship started off "not good," Plaintiff responded that they "[j]ust didn't get along.  Like, he

had his thoughts and I had mine."  (Id. at 56:18–21.)  Defendants maintain that Plaintiff's

46

allegations of "harassment" are unrelated to his FMLA leave request and that they were instead related to "disagreements between Plaintiff and Mr. Swichar on operation of the sewer plant." (Defs.' Mem. Supp. Mot. Summ. J. 22 (citing Plaintiff Dep. 60:6–11).)[27]  In the portion of Plaintiff's deposition that Defendants cite, Plaintiff testified that he and Defendant Swichar had "a lot of disagreements."  (Id.)  Plaintiff also testified, however, that he viewed those disagreements as being between himself as a union shop steward and Defendant Swichar, as opposed to between himself as a worker and Defendant Swichar.  (Id. at 60:12–18.)

In support of their argument, Defendants cite LeBoon v. Lancaster Jewish Community Center Association for the proposition that "[t]here can be no inference of retaliation when the employee and the employer have had a strained relationship that pre-dates the protected activity."  (Defs.' Reply 5 (citing LeBoon, 503 F.3d 217, 234 (3d Cir. 2007)).)[28]  In LeBoon, the Third Circuit determined that

> although the evidence in the record clearly shows a tense relationship between [Plaintiff] and [her supervisor], it does not sustain the inference that it was caused by [Plaintiff's] protected activity.  Rather, there is a clear pattern of [Plaintiff's] complaining to Board members about [her supervisor] or insisting on respect for formalities and [her supervisor's] displeasure at these reports and limitations on her authority even before any mention of possible discriminatory conduct on the part of the LJCC; there are also clear indications that [Plaintiff] was not the only person who suffered

---

[27] Defendants also assert that because Defendant Swichar never spoke to Plaintiff about his FMLA leave, Plaintiff is unable to establish that the alleged antagonistic conduct had any relation to the FMLA request.  (Defs.' Mem. Supp. Mot. Summ. J. 22 (citing Plaintiff Dep. 60:19–21).)  However, as discussed above, even if Plaintiff and Defendant Swichar never spoke to each other directly about Plaintiff's FMLA leave request or use of FMLA, there is record evidence which shows that Defendant Swichar was aware that Plaintiff had applied for FMLA leave and that Plaintiff believed he was using FMLA leave at various times.  Accordingly, this argument is not dispositive with respect to any causal connection between Plaintiff's FMLA request or use of FMLA leave and the alleged adverse employment actions.

[28] Both Defendants and Plaintiff provided the incorrect citation for LeBoon in their Reply and Sur-reply briefs.  (See Defs.' Reply 5; Pl.'s Sur-reply 9.)  The correct citation is above.

the consequences of complaining to the Board about [the supervisor].

LeBoon, 503 F.3d at 234.  By contrast, in this case, each of the events Plaintiff identified as part of the ongoing acts of antagonism occurred in close temporal proximity to Plaintiff's use or attempted use of FMLA leave, or sick leave that Plaintiff may have believed was being treated as FMLA leave.  While Plaintiff and Defendant Swichar may not have had a good working relationship generally, that fact would not negate any causal connection between Plaintiff's attempts to use FMLA leave and the conduct of Defendant McCauley.  Likewise, the fact that Plaintiff and Defendant Swichar did not have a good working relationship, either because of Plaintiff's role as shop steward or for other reasons, does not negate any causal connection that may be inferred from the temporal proximity between Defendant Swichar's conduct and Plaintiff's invocation of his FMLA rights and/or attempts to use FMLA leave.  Because Plaintiff has shown some evidence to support an inference that he may have been constructively discharged because of his attempts to use FMLA leave, the Third Circuit's findings in LeBoon do not require a finding of summary judgment in Defendants' favor simply because Plaintiff had also previously experienced conflicts with Defendant Swichar or Defendant McCauley.

Ultimately, Plaintiff has adduced evidence to show that the adverse employment actions he identified are causally connected to his invocation of FMLA rights.  First, with respect to the encounter between Plaintiff and Defendant Swichar and Paula Kearns at the VFW on June 6, 2013, a rational juror could find that this alleged surveillance was causally connected to Plaintiff's invocation of FMLA rights.  Second, with respect to the Breathalyzer test, genuine issues of material fact remain as to whether Plaintiff's consent to the test was voluntary and whether subjecting Plaintiff to the test was in retaliation for using leave.  Thus, a rational juror could also find that requiring Plaintiff to take the Breathalyzer test on June 10, 2013 was in

retaliation for Plaintiff taking leave the week before.  Third, in light of the emails exchanged among Defendant McCauley, Defendant Swichar, and Kate Murphy, as well as other record evidence, a reasonable jury could find that the June 18, 2013 letter ordering Plaintiff to return to work or face discipline or discharge was causally connected to Plaintiff's use and/or attempts to use FMLA leave prior to that date.  Fourth, genuine issues of material fact remain as to the reason for a nearly two-year delay in Defendants providing Plaintiff with a check for his accrued and unused vacation pay, allowing a reasonable jury to find that the delay was causally connected to Plaintiff's invocation of FMLA leave.  Finally, based on the foregoing, as well as the above discussion as to whether Plaintiff can make out a claim for constructive discharge sufficient to survive summary judgment, a reasonable jury could conclude that Plaintiff was constructively discharged and that the termination of his employment was causally connected to his invocation of FMLA rights.

On the basis of the above discussion, Defendants have not shown that they are entitled to summary judgment on the third element of a prima facie case of FMLA retaliation.  Accordingly, the Court turns to the second and third steps of the burden-shifting framework: a discussion of Defendants' proffered evidence in support of their assertions that there were legitimate, nondiscriminatory reasons for the employment actions, and Plaintiff's arguments that those reasons are pretextual.

### 2.  **Evidence of Pretext**

Defendants argue that Plaintiff's FMLA retaliation claims fail because he cannot prove that Defendants' actions were a pretext for unlawful retaliation.  (Defs.' Mem. Supp. Mot. Summ. J. 22.)  Defendants deny that Plaintiff suffered any adverse employment actions, and assert that they have "clearly established that their notice of potential discipline, and other

alleged harassment, arose from the parties' disagreements over the institution and application of the CBA and Plaintiff's abuse of sick leave." (Id. at 23.)  In support of this contention, Defendants point to Defendant McCauley's belief that Plaintiff had been engaging in a pattern of taking sick days on Mondays and Fridays, and that Plaintiff had reportedly been seen at the VFW on a day that he had called out sick.  (Id. (citing McCauley Dep. 66:20–67:16; Defs.' Ex. 9, Bristol Township Employee Handbook at Art. XV).)

This argument fails for several reasons.  First, Defendants have not "clearly established" that the conduct which Plaintiff alleges constitutes adverse employment actions was only connected to union-related disagreements and Defendant McCauley's belief that Plaintiff was abusing his sick time.  Defendants' burden is to produce evidence sufficient to support a finding that there was a legitimate, nondiscriminatory reason for the employment action.  See St. Mary's Honor Ctr., 509 U.S. at 506–07.  As discussed above, there remain many issues of material fact regarding Defendants' conduct, the reasoning for their actions, and, in particular, the meaning of the June 18, 2013 email exchanges which seem to indicate that Defendants knew that Plaintiff believed he was using FMLA leave while Defendants were discussing the potential to terminate Plaintiff for exhausting his sick leave.  In light of that evidence, Plaintiff's arguments that Defendants' proffered reasons are pretextual are sufficient to preclude summary judgment for Defendants.

Second, Defendants' arguments with regard to Plaintiff's allegations of constructive discharge do not entitle them to summary judgment as to that alleged adverse employment action.  Defendants argue that, at the time Plaintiff retired, no disciplinary action had been instituted against him and that his supervisor "merely advised him that his sick leave was exhausted and that he was expected to return to work."  (Defs.' Mem. Supp. Mot. Summ. J. 23.)

Defendants maintain that they had a legitimate, non-discriminatory reason to notify Plaintiff of potential disciplinary action because Plaintiff had taken one and a half days of unapproved sick leave immediately after a one-week vacation, and Plaintiff should have addressed any concerns with the manner in which Defendants notified him on June 18, 2013 pursuant to the Union grievance procedure.  (Id.)  But the occurrence of Plaintiff's retirement, which he alleges was actually a constructive discharge, is not evidence that Defendants did not retaliate against Plaintiff for invoking his FMLA rights.  Similarly, the fact that Plaintiff did not pursue a union grievance before turning in his retirement papers is not evidence that Defendants did not act based on discriminatory reasons.  In light of the record evidence regarding Defendants' and Plaintiff's conflicting understandings of whether and when Plaintiff was using FMLA leave as opposed to sick leave, and the additional issues of material fact that remain in this case, the explanations that Defendants have offered for the alleged adverse employment actions do not entitle them to summary judgment.

On the basis of the above discussion, Plaintiff has established both a prima facie case of retaliation in violation of the FMLA and the existence of genuine issues of material fact regarding whether the Defendants' proffered reasons are pretextual for retaliation under the FMLA.  Thus, Defendants' Motion for Summary Judgment with respect to Counts Fourteen, Fifteen, and Sixteen is denied.

### 3.  **Defendant Swichar**

Defendants make a separate argument for summary judgment as to Count Fourteen,[29] which alleges an FMLA retaliation claim against Defendant Swichar.  Defendant Swichar asserts

_____

[29] Apparently, Defendants wish to make this argument with respect to Plaintiff's FMLA interference claims in Count Ten as well as the FMLA retaliation claims in Count Fourteen,

that Plaintiff cannot establish an FMLA claim against him because he is not an "employer" under the terms of the FMLA, and that therefore all FMLA claims for individual liability against Defendant Swichar should be "dismissed with prejudice."  (Defs.' Mem. Supp. Mot. Summ. J. 24.)

Under the FMLA, an "employer" is "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer."  29 U.S.C. § 2611(4)(A)(ii)(I).  Such language "plainly contemplates that liability for FMLA violations may be imposed upon an individual person who would not otherwise be regarded as the plaintiff's 'employer.'"  Haybarger v. Lawrence Cty. Adult Prob. & Parole, 667 F.3d 408, 413 (3d Cir. 2012).  In the Third Circuit, "this language means that an individual is subject to FMLA liability when he or she exercises 'supervisory authority over the complaining employee and was responsible in whole or part for the alleged violation' while acting in the employer's interest."  Id. at 417 (quoting Riordan v. Kempiners, 831 F.2d 690, 694 (7th Cir. 1987)).  The Third Circuit has determined that courts should use an "economic reality" test "[i]n analyzing an individual supervisor's control over the employee under the FLSA [or] the FMLA, . . . examining whether the individual supervisor carried out the functions of an employer with respect to the employee."  Haybarger, 667 F.3d at 417.[30]  "[W]hether a person functions as an employer depends on the

---

though this argument does not appear in the portion of Defendants' brief devoted to Count Ten. (See Defs.' Mem. Supp. Mot. Summ. J. 24 ("Thus, Counts X and XIV should be dismissed.").)

[30] Plaintiff notes that Defendants neglected to cite the Third Circuit's decision in Haybarger in their brief.  (Pl.'s Resp. Opp'n Summ. J. 32 n.67.)  Defendants instead relied on an opinion by this Court which predated the Third Circuit's decision in Haybarger.  (See Defs.' Mem. Supp. Mot. Summ. J. 24 (quoting Fleck v. WILMAC Corp., No. Civ.A.10-05562, 2011 WL 1899198, at *13 (E.D. Pa. May 19, 2011) ("Courts have held that such individual liability attaches under the FMLA when an employee has 'exercised control' over a plaintiff's FMLA leave or acts on behalf of the employer.") (citation omitted)).)

totality of the circumstances rather than on 'technical concepts of the employment relationship.'"
Id. at 418 (quoting Hodgson v. Arnheim & Neely, Inc., 444 F.2d 609, 612 (3d Cir. 1971) rev'd
sub nom. Brennan v. Arnheim & Neely, Inc., 410 U.S. 512 (1973)).  The Third Circuit expressed
approval of the factors identified by the U.S. Court of Appeals for the Second Circuit, which can
include "whether the individual '(1) had the power to hire and fire the employee[ ], (2)
supervised and controlled employee work schedules or conditions of employment, (3)
determined the rate and method of payment, and (4) maintained employment records.'"
Haybarger, 667 F.3d at 418 (quoting Herman v. RSR Sec. Servs. Ltd., 172 F.3d 132, 139 (2d Cir.
1999) (further citations omitted) holding modified by Zheng v. Liberty Apparel Co. Inc., 355
F.3d 61 (2d Cir. 2003)).  The Third Circuit also noted the Second Circuit's caution that "courts
must consider 'any relevant evidence' and 'no one of the four factors standing alone is
dispositive.'"  Haybarger, 667 F.3d at 418 (quoting Carter v. Dutchess Cmty. Coll., 735 F.2d 8,
12 (2d Cir. 1984) (citing Rutherford Food Corp. v. McComb, 331 U.S. 722, 730 (1947))).

　　　　According to Defendants, Defendant Swichar was not Plaintiff's "employer" for purposes
of FMLA interference or retaliation claims for the following reasons: (1) Defendant Swichar was
not involved in approving or disapproving Plaintiff's FMLA leave; (2) Plaintiff never spoke to
Defendant Swichar about his leave nor submitted any paperwork to him; and (3) Plaintiff has not
adduced evidence showing that Defendant Swichar had any involvement in applying FMLA
leave to Plaintiff's time off of work.  (Defs.' Mem. Supp. Mot. Summ. J. 24.)  The record
evidence submitted by the parties does not definitively support Defendants' characterization of
the evidence.  On the one hand, Plaintiff testified at his deposition that he never spoke to
Defendant Swichar about his request for FMLA leave.  (Plaintiff Dep. 60:19–21.)  On the other
hand, Paula Kearns sent an email regarding Plaintiff to Defendant Swichar on February 25, 2013,

which said "[e]mployee continues on FMLA," indicating that Defendant Swichar was aware that Plaintiff was using or attempting to use FMLA leave for several months prior to Plaintiff's last day of work.  (See McCauley Dep. 70:21–73:1 (discussing email from Kearns to Defendant Swichar).)  Moreover, the emails exchanged among Defendant McCauley, Defendant Swichar, and Kate Murphy show that Defendant Swichar was aware that Plaintiff believed he was out on FMLA leave, but that his time off was actually being treated as sick time.  (See Pl.'s Exs. 12–14.)

    In addition to the foregoing record evidence, Plaintiff relies on the following facts to support his argument that Defendant Swichar was a supervisor who exercised control over Plaintiff such that he may be individually liable under the FMLA: (1) Defendant Swichar was Plaintiff's direct supervisor; (2) Defendant Swichar supervised and controlled employee work schedules; (3) Defendant Swichar managed attendance issues; (4) Defendant Swichar had the ability to approve vacation leave; (5) Defendant Swichar had the ability to "write up" employees, including Plaintiff, for misconduct; (6) Defendant Swichar was dispatched to investigate Plaintiff's presence at the VFW on June 6, 2013; (7) Defendant Swichar required Plaintiff to submit to a Breathalyzer test on June 10, 2013; and (8) at Defendant McCauley's direction, Defendant Swichar prepared, signed, and delivered the June 18, 2013 letter warning Plaintiff that he could face discipline or discharge if he did not return to work after exhausting his sick time. (Pl.'s Resp. Opp'n Summ. J. 33; Unemployment Compensation Appeal Tr. at 7; Pa. Labor Relations Bd. Hrg. Tr. 55:7–9; Plaintiff Dep. 43:10–23, 80:2–82:9, 85: 4–11; Pl.'s Ex. 8, June 18, 2013 Letter from Defendant Swichar to Plaintiff.)  Thus, genuine issues of material fact remain as to whether Defendant Swichar engaged in adverse employment actions that constitute interference and/or retaliation under the FMLA, and whether, under a totality of the

circumstances, he acted as Plaintiff's "employer" such that he may be individually liable under the FMLA.

In light of the record evidence in this case, the Court finds that genuine issues of material fact remain as to whether Defendant Swichar exercised sufficient control over Plaintiff's employment such that he was Plaintiff's "employer" for purposes of Plaintiff's FMLA interference and retaliation claims.  Put differently, a rational juror could find that Defendant Swichar had sufficient control over Plaintiff's employment so as to be subject to liability for FMLA violations that he caused to occur.  See Haybarger, 667 F.3d at 418.  Accordingly, Defendants' Motion for Summary Judgment as to the individual claims against Defendant Swichar for FMLA interference and retaliation in Counts Ten and Fourteen is denied.

## G. **Breach of Contract (Count XVII)**

Plaintiff also asserts a breach of contract claim against Defendant Bristol Township for failure to provide him with payment for accrued and unused vacation time totaling $3,237.18,[31] in violation of the Collective Bargaining Agreement ("CBA") between the Transportation Workers Union of America, Local 281 and Defendant Bristol Township.  (Am. Compl. ¶¶ 256–59.)

Defendants assert that Plaintiff's breach of contract claim must be dismissed as moot, because, on April 15, 2015, Defendants' counsel sent Plaintiff a check for the accrued and unused vacation time, and because Plaintiff did not state any objection to the payment.  (Defs.' Mem. Supp. Mot. Summ. J. 24.)  Plaintiff argues that the issue of his unpaid vacation pay has not been adequately resolved, and that he "has adduced sufficient evidence from which a reasonable

---

[31] Plaintiff alleged breach of contract damages in the amount of $3,237.18.  (See Am. Compl. ¶ 258.)  Neither party addresses or explains the difference between the damages claimed in the Amended Complaint and the amount, $2,102.45, that was ultimately paid to Plaintiff in April 2015.  (See Defs.' Ex. 16.)

jury could find the withholding of the accrued but unpaid vacation pay was an adverse

employment action which constituted retaliation for Plaintiff's invocation of his FMLA rights

and use of FMLA-eligible leave."  (Pl.'s Resp. Opp'n Summ. J. 35.)  Plaintiff asserts that if a

jury finds in his favor with regard to his FMLA retaliation claims, then "he is entitled to

liquidated damages (or interest, whichever is higher), attorney fees, and costs on the withheld

wages."  (Id.)

An employer who violates a plaintiff's FMLA rights may be liable for lost wages or

salary, any interest on those lost wages or salary, and/or an additional amount as liquidated

damages.  29 U.S.C. § 2617(a)(1)(i)–(iii).  Under Pennsylvania law, "wages" "[i]ncludes all

earnings" of an employee, including "fringe benefits," which is in turn defined as including

vacation pay.  43 Pa. Con. Stat. § 260.2a; see also Braun v. Wal-Mart Stores, Inc., 24 A.3d 875,

956 (Pa. Super. Ct. 2011) (stating that the Pennsylvania Wage Payment and Collection Act

"specifically covers monetary compensation such as separation, vacation and holiday pay, and

bonuses") aff'd, 106 A.3d 656 (Pa. 2014).  Where an FMLA plaintiff has been reimbursed for

lost wages, but where there was a significant delay prior to the reimbursement, that plaintiff may

claim both interest and liquidated damages on the lost wages if the trier of fact ultimately

concludes that the lost wages were withheld in retaliation for the invocation of FMLA rights.

See  McCall v. City of Phila., No. Civ.A.11-5689, 2014 WL 735583, at *12 (E.D. Pa. Feb. 25,

2014) aff'd, No. 14-4374, 2015 WL 7274068 (3d Cir. Nov. 18, 2015) (finding that a plaintiff

could claim liquidated damages and/or interest as part of an FMLA retaliation claim where there

was a fifteen-month lapse prior to payment of back pay).

Neither party has addressed whether the damages provisions of the FMLA would apply

in the context of Plaintiff's state law breach of contract claim, whether these damages should

instead only be considered in connection with Plaintiff's claim of FMLA retaliation based on the withheld vacation pay, discussed above with regard to Counts Fourteen, Fifteen, and Sixteen, or whether Plaintiff can, and intends, to assert damages in the form of accrued interest on the delayed payment of his vacation pay as part of this state law breach of contract claim. In light of these omissions in the parties' briefs, Defendants' Motion for Summary Judgment as to Count Seventeen is denied.

### H.   ADEA Violation for Disparate Treatment (Counts XVIII, XIX, and XX)

Defendants argue that they are entitled to summary judgment on Plaintiff's ADEA claims because Plaintiff has not established that age was a factor in the decisions related to his FMLA requests or any other employment actions allegedly taken against him. (Defs.' Mem. Supp. Mot. Summ. J. 26.) Plaintiff "does not agree with the Defendants' position" but "respectfully requests to withdraw the ADEA claims alleged" in Counts Eighteen, Nineteen, and Twenty.[32] (Pl.'s Resp. Opp'n Summ. J. 35.) Thus, Defendants' Motion for Summary Judgment with respect to Counts Eighteen, Nineteen, and Twenty is granted.

### I.   Punitive Damages Claims

Finally, Defendants argue that they are entitled to summary judgment on Plaintiff's punitive damages claims against Defendants McCauley and Swichar for Fourth Amendment violations because Plaintiff knowingly and voluntarily consented to the Breathalyzer test. (Defs.' Mem. Supp. Mot. Summ. J. 27; Defs.' Reply 5.)

In order "for a plaintiff in a section 1983 case to qualify for a punitive award, the defendant's conduct must be, at a minimum, reckless or callous." Savarese v. Agriss, 883 F.2d

---

[32] Plaintiff incorrectly refers to Counts Seventeen, Eighteen, and Nineteen as his ADEA claims. Count Seventeen is the breach of contract claim. Because Plaintiff refers to the claims as "his age discrimination claims under the ADEA," the Court presumes that Plaintiff does not wish to withdraw his claim in Count Seventeen, but rather his claims in Counts Eighteen, Nineteen, and Twenty. (See Pl.'s Resp. Opp'n Summ. J. 35.)

1194, 1204 (3d Cir. 1989) (citing Smith v. Wade, 461 U.S. 30, 56 (1983) ("We hold that a jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.")).  "Punitive damages might also be allowed if the conduct is intentional or motivated by evil motive, but the defendant's action need not necessarily meet this higher standard."  Id.

Defendants argue that Plaintiff has not established that they acted with the necessary motive and intent required to impose punitive damages in connection with the Breathalyzer test. (Defs.' Mem. Supp. Mot. Summ. J. 28.)  In light of the record evidence discussed above in connection with Counts Two and Three, as well as Plaintiff's FMLA retaliation claims in Counts Fourteen, Fifteen, and Sixteen, Defendants have not demonstrated the absence of a genuine issue of material fact as to Defendants McCauley's and Swichar's motivations for requiring Plaintiff to take the Breathalyzer test.  Accordingly, Defendants' Motion for Summary Judgment is denied with respect to Plaintiff's punitive damages claims against Defendants McCauley and Swichar in their individual capacities for allegedly violating Plaintiff's Fourth Amendment rights.

## IV.    CONCLUSION

In light of the foregoing, Defendants' Motion for Summary Judgment is granted in part and denied in part.  Having reviewed the briefs and their exhibits, the Court finds that Defendants have established their right to summary judgment as to Plaintiff's FMLA interference claims regarding the second certification in Counts Eight, Nine, Ten, Eleven, Twelve, and Thirteen, as well as Plaintiff's FMLA retaliation claims regarding the second certification in Counts Fourteen, Fifteen, and Sixteen.  Defendants' Motion is also granted with respect to Counts Eighteen, Nineteen, and Twenty, based on Plaintiff's voluntary withdrawal of

those claims.  Genuine issues of material fact remain, however, as to Plaintiff's Fourth Amendment claims, the municipal liability failure to train claim, the remaining aspects of Plaintiff's FMLA interference and retaliation claims, the breach of contract claim, and Plaintiff's claims for punitive damages against Defendants McCauley and Swichar in their individual capacities in connection with Plaintiff's Fourth Amendment claims.  Therefore, the Court must deny Defendants' Motion for Summary Judgment as to Counts Two, Three, Seven, all remaining aspects of Counts Eight, Nine, Ten, Eleven, Twelve, Thirteen, Fourteen, Fifteen, and Sixteen, Count Seventeen, and the punitive damages claims in connection with Counts Two and Three.

An appropriate Order follows.